*Decision will be entered under Rule 50.*

DONALD P. OAK AND LOUISE ARGUE OAK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 106253. Promulgated February 4, 1942.

266

*Hilary D. Mahin, Esq.,* and *L. Karlton Mosteller, Esq.,* for the petitioner.
*W. H. Payne, Esq.,* for the respondent.

OPINION.

Mellott: The Commissioner determined a deficiency in the income tax of Donald P. Oak for the calendar year 1937 in the amount of $1,362.96 and joint deficiencies in the income tax of Oak and his wife, Louise Argue Oak, for the years 1938 and 1939 in the respective amounts of $210.92 and $376.94. The instant proceeding, contesting all of the deficiencies, was submitted upon a stipulation of facts. The issues, stated generally, involve claimed deductions from gross income of 10 percent of the excess of expenditures over receipts from oil and gas properties, the expenditures having been made by the owners of the properties, who, in consideration of services rendered by Oak, had agreed to "carry" him for an undivided one-tenth interest in the properties, as set out in a trust and in an agreement attached to the stipulation. We find the facts to be as stipulated; but the following summary will suffice for present purposes.

Petitioners filed their income tax returns on the cash receipts and disbursements basis with the collector of internal revenue for the district of Oklahoma. Separate returns were filed for the year 1937 and joint returns for the years 1938 and 1939. Inasmuch as the transactions giving rise to the present controversy were carried out by Donald P. Oak, he, for convenience, will hereinafter be referred to as petitioner.

In 1936 petitioner, with funds advanced by H. J. Walter, obtained and caused to be assigned to Walter certain oil and gas leases in Oklahoma. As consideration for petitioner's services in connection therewith Walter executed a declaration of trust in favor of petitioner as to an undivided one-tenth interest in the leases and the equipment thereon. The declaration of trust provides, *inter alia*, as follows:

\* \* \* that for and in consideration of services heretofore rendered to me by Donald P. Oak \* \* \* in the acquisition of the foregoing leases \* \* \* I \* \* \* do hold an undivided one-tenth (1/10) interest of all of my right, title and interest in and to the above described oil and gas mining leases \* \* \* together with all equipment \* \* \* now located thereupon or which may hereafter be located thereupon and an undivided one-tenth (1/10) interest in all facilities, including water rights and other easements, upon lands \* \* \* in' trust for the use and benefit of said Donald P. Oak \* \* \* subject (a) to a lien in my favor for an amount equal to one-tenth (1/10) of the cost of the acquisi-

tion of said leases * * * plus one-tenth (1/10) of all sums of money heretofore advanced and hereafter to be advanced by me in connection with the development and operation of said leases and plus one-tenth (1/10) of any and all sums of money advanced by me in making up any deficiencies in connection with the over-riding one-eighth (1/8) royalties provided for in the various contracts * * * plus six per cent (6%) interest per annum upon one-tenth (1/10) of all said sums or the balance of said sums for which * * * I have not been reimbursed, and subject (b) to the right to receive all of the proceeds from all of said leases * * * and the material and equipment used in connection therewith * * * until the lien aforesaid shall have been discharged.

I do hereby declare that the true intent and purpose of this instrument is that, when there has been returned to me, out of the proceeds of said leases or interests * * * all sums of money expended by me in the acquisition of said leases * * * for the operation and development of the same and for facilities used in connection therewith * * * and in making up any deficiencies in connection with the one-eighth (1/8) over-riding royalties * * * plus six per cent (6%) interest per annum on one-tenth (1/10) of the sums of money or the balance thereof remaining from time to time unreturned to me; or when one-tenth (1/10) of said sums have been paid to me by the said Donald P. Oak, plus six per cent (6%) interest per annum thereon (he to have the option to pay the same at any time, or from time to time any part thereof, as he may elect) the above lien shall be discharged.

When the said lien is discharged, * * * Oak shall be entitled to receive from me an assignment * * * of an undivided one-tenth (1/10) interest in * * * [the] leases * * * and all material and equipment then located thereupon and of an undivided one-tenth (1/10) interest in and to all other facilities, * * * used in connection with the operation and development of said leases * * * , excepting leases or interests in leases and other property which may have been disposed of with the consent of said Donald P. Oak, said assignments to be subject to the terms and conditions of each and all of the contracts hereinbefore referred to.

The leases and interests covered by the trust were operated and developed in accordance with the provisions of the trust instrument. Petitioner, during the taxable years, did not become entitled to receive, nor did he receive, assignment of an interest in any of the properties.

During the calendar year 1937 the total gross receipts from the properties amounted to $53,523.34. The expenditures for intangible development costs, labor, supplies, insurance, taxes, depreciation, etc., totaled $96,932.52, or $43,409.18 in excess of the receipts. Petitioner, in his 1937 income tax return, claimed as a deduction $4,340.92, this amount being 10 percent of the $43,409.18 referred to above. "In arriving at this $4,340.92, there was used $785.78 representing 10% of the depreciation sustained during 1937 upon the equipment used on these properties, and $4,313.75 representing 10% of the intangible development costs expended during 1937 upon these properties." Upon the books of Walter there was charged during the calendar year 1937, to the account of petitioner, the sum of $1,008.64 representing interest at 6 percent as provided for in the declaration of trust. This

sum petitioner claimed as a deduction in his 1937 income tax return. (In 1938 and 1939 the expenditures also exceeded the gross receipts. Deductions, computed in the same manner that the deductions for 1937 were computed, were claimed, the particulars being set out in the stipulation.)

In January 1937, petitioner entered into two option agreements to purchase oil and gas leases in Kansas. In July 1937, petitioner assigned the option agreements to H. J. Walter and the Darby-Lynde Co. The oil and gas leases covered by the two option agreements were acquired with funds advanced by Walter and the Darby-Lynde Co. The written agreement, signed by petitioner, Walter and the Darby-Lynde Co. (the two latter being referred to as Associates) provides, *inter alia:*

3. Associates agree to carry Oak for an undivided 10% interest in and to the properties herein agreed to be conveyed * * * to the Associates. That is to say, that Oak shall be entitled to receive 10% of the net profits accruing to Associates from the acquisition, development and operation or sale of said leases. Provided, however, that in the event Oak should become incapacitated or die within one year from September 1, 1937, his net interest in said leases shall be reduced to 2½ percent. * * * within two years * * * his net interest shall be reduced to five percent, and * * * within three years * * * his interest shall be reduced to 7½ percent, and * * * the said Oak * * * shall [not] be entitled to make any claim for any greater percentage than is herein limited, and Provided further, that the net profits accruing to Oak shall be first used and applied to reimburse Associates for Oak's proportion of all disbursements made * * * under the provisions or recitations of this agreement * * *. That is to say, the same percentage of all thereof, that Oak is carried for in the leases. Provided that at all times, the Associates shall be entitled to receive àll of the gross earnings and proceeds arising from the sale of oil [etc.] produced from the * * * properties acquired hereunder, and shall, after they have received a re-payment of all their disbursements * * *, development and operating expenses, pay to Oak, the percentage of the monthly net profits to which he is entitled, * * *. It is further provided that until after the Associates shall have received a return of all of their disbursements aforesaid, Oak shall not be entitled to have any written assignment of any interest in said leases, but thereafter, the said Oak may at his option, require Associates to execute to him a written assignment of his interest in said leases, and it is further provided that if by reason of the execution of any such assignment, any percentage of the earnings * * * is paid to Oak, then Oak shall immediately pay to the Associates, his proportionate percentage of the operating cost and further development cost of the leases, and he shall be liable for any losses to the full extent of any of his said receipts.

4. Oak agrees to devote his best efforts, and such of his time as is necessary, as shall be directed by Associates, to the end that the property may be properly operated and developed, and subject to the pleasure of Associates, and for the period of time they shall see fit, Oak shall have general supervision and management of the development and operation of the leases. In consideration for his time and efforts, Associates shall pay to the said Oak, as an item of development and operating expense, his actual personal, automobile and traveling expenses, while engaged in such supervision or management work, not to

exceed the sum of One Hundred ($100.00) Dollars per month. Provided however, that said consideration shall be subject to adjustment by mutual agreement each six months, if found to be inequitable. The accounts of Oak, with reference to his actual personal, automobile and traveling expenses while engaged in the work of supervising and managing the development and operation of the leases, shall be subject to reasonable auditing and checking by Associates.

Under the agreement Associates were to have uncontrolled discretion as to the management and operations of the properties and the right to dispense with the services of petitioner at any time, with or without cause. Petitioner was to continue to use his best efforts to acquire, in the name of Associates, other leases in the same vicinity and was to be "carried for the same percentage interest therein on the same terms and conditions" as shown above. The leases were to be "considered as a complete whole" and disbursements were to be borne proportionately, but "Associates shall look solely to Oak's interest for the payment of his share thereof." Petitioner was to "be considered a non-operator", could not "control the activities or expenditures of Associates", and could not be required to advance any money for operation, development, or acquisition "except from monies actually received by him representing  *  *  *  earnings  *  *  * but his percentage interest in the leases shall at all times be liable for the same percentage of all disbursements, costs and development operating expenses."

Operations of the properties under the above agreement were started on September 15, 1937. From such date to December 31, 1937, the total gross receipts from the properties aggregated $6,874.02 and the expenditures for intangible development costs, labor, supplies, insurance, taxes, including depreciation, etc., totaled $56,583.32, resulting in an excess of expenditures for 1937 of $49,709.30. Petitioner, in his 1937 income tax return, claimed as a deduction 10 percent of such $49,709.30, or $4,970.93. In this $4,970.93 was included $237.24 representing 10 percent of the depreciation sustained during 1937 upon the equipment used on the properties, and $4,088.58 representing 10 percent of the intangible development costs expended during 1937 upon the properties. (In 1938 and 1939 the expenditures also exceeded the gross receipts. Deductions, computed in the same manner that the deductions for 1937 were computed, were claimed, the particulars being set out in the stipulation.)

Respondent determined that petitioner is not entitled to deduct a proportionate part of the excess of expenditures over receipts, either under the trust instrument or under the operating agreement between petitioner and his associates; that the so-called interest is not in fact interest since there was no obligation on the part of the petitioner to make repayment of money advanced for, or loaned to, him; and that petitioner's earned income credit claimed on the return in the amount

of $1,202.49 should be reduced to $959.16 (10 percent of the total earned income of $9,591.64 as recomputed). Petitioner contends that the declaration of trust and the agreement of July 1937 each constitutes a joint venture; that he, as a joint venture participant, is required to report for income tax purposes the gains or losses attributable to his pro rata part of the partnership property and therefore that he is entitled to deduct the necessary expenses of operation, including depreciation, and, so far as the trust is concerned, the interest charged to his account. In the alternative he contends that if he is not entitled to deduct the losses as claimed then he should be permitted to capitalize them, as well as the other expenditures for capital improvements, as the cost of his interest in the properties. Respondent, by an amendment to his answer, avers that even if petitioner owned such an interest in the properties operated under the trust or under the agreement that he should be required to include in his income a portion of the gross receipts and be permitted to deduct depletion and depreciation, still, in so far as such expenditures represent costs of development, they must be capitalized. He also contends that, under such circumstances, the allowance to petitioner for depreciation and depletion, together with operating expenses, may not, in any event, exceed the gross receipts derived by him from his interests in the properties.

The parties seem to agree that the claimed losses and interest are not deductible in computing petitioner's net income unless he was a joint adventurer; for he was on the cash basis, the transactions were not completely closed, no loss had been "fixed by an identifiable event", no interest had actually been paid, and his obligation to pay interest was contingent upon acquisition of a portion of the property, either by actual payment in cash or by the use of an aliquot part of the excess of the earnings over the expenditures. Then, too, his right to claim depreciation rests primarily upon ownership of the property which is being depreciated by use or lapse of time. Joint ventures, however, are classified as "partnerships" under the revenue act (sec. 1001 (a) (3), Revenue Act of 1936) and, in computing the net income of each partner there is included, "whether or not distribution is made to him, * * * (c) his distributive share of the ordinary net income or the ordinary net loss of the partnership * * *." (Sec. 182, Revenue Act of 1938.) Cf. sec. 182, Revenue Act of 1936, and art. 182–1, Regulations 94. The first question to be determined, therefore, is whether petitioner was a joint adventurer.

Petitioner contends that the "arrangements represent typical joint ventures as they exist in the oil industry and that his interest in each joint venture is characterized as a 'carried interest'." He relies chiefly upon *Shoemake* v. *Davis*, 146 Kans. 909; 73 Pac. (2d) 1043; and *Dike* v. *Martin*, 85 Okla. 103; 204 Pac. 1106, citing also *Motter*

v. *Smyth*, 77 Fed. (2d) 77. The cited cases do not attempt to lay down any general rule to the effect that every one having a "carried interest" is a joint adventurer. *Dike* v. *Martin* primarily involved subsequent dealings between parties who had originally been joint adventurers. The court held that, since the relation between joint adventurers is fiduciary in character and demands "the utmost good faith", the refusal of the defendant to permit the plaintiff to pay his share of the development expenses and thereby become entitled to his share of the profits would not be countenanced. While *Shoemake* v. *Davis* did involve a "carried interest", neither the lower court nor the appellate court placed any particular significance upon the term. "The parties adduced their evidence on what the language 'carry me for a quarter interest' did mean and the trial court's finding on the controverted fact [to the effect that the plaintiff is the owner of an undivided one-fourth interest in the lease] is conclusive." The court specifically refused to accept the view, urged upon it by the defendant, that the courts of Oklahoma take "judicial notice that in the acquisition and sale of oil and gas leases such language as the parties here used 'carry me for a quarter interest' means the specified interest of a broker of leases * * *." *Motter* v. *Smyth* involved a joint attempt of father and son to effectuate a sale to one railroad of the controlling stock in another which the court held constituted a joint adventure.

The cases, including those discussed in the preceding paragraph, seem to hold that whether a joint adventure exists is a mixed question of law and fact, depending, in no small degree, upon the intention of the parties. *First Mechanics Bank of Trenton* v. *Commissioner*, 91 Fed. (2d) 275. In resolving it the instruments signed by the parties, if unambiguous, are entitled to great weight; but consideration may also be given to the circumstances under which they were executed, the objects sought to be accomplished, and any and all facts showing or tending to show what their actual intention was. Since all of the facts were stipulated in the instant proceeding, the question is essentially one of law. Succinctly stated, it is: Were the parties joint adventurers in the development and operation of the oil properties?

The trust instrument does not purport to be a contract between the parties. It was not signed by petitioner, though for present purposes it may be assumed it was accepted by him. No evidence was adduced showing the circumstances under which it was executed, the stipulation showing merely that petitioner had "obtained for and caused to be assigned to * * * Walter * * * certain oil and gas leases * * *. As consideration for the services of Donald P. Oak, in connection with the acquisition of the leases and as a part of this deal * * * Walter * * * executed" the

trust. The oil and gas leases "were acquired with funds advanced by H. J. Walter and were developed and operated in accordance with the provisions of this Declaration of Trust with funds advanced by H. J. Walter." Do these facts collectively show that petitioner was a joint adventurer? We think not. The properties belonged to Walter and he could do with them as he saw fit. He could develop them or let them stand fallow. Petitioner had no voice in determining whether or where a well should be drilled or when it or any of the properties should be abandoned. He could not bind Walter, or any "joint venture" composed of him and Walter, upon any contract with third parties, nor could Walter bind him. Walter individually took all of the risks and the losses were his, not petitioner's. Petitioner, at best, acquired no more than a contingent right to obtain something of value at some uncertain time in the future in the event the operation of the properties by Walter should produce sufficient revenue to exceed the cost of acquisition, development and operation, plus interest at 6 percent upon one-tenth of all sums expended by Walter for which he had not been reimbursed. Whether such right be characterized as additional compensation for services, a bonus, a gift, or an agreement under which a contingent, possible, future, joint venture is to be brought into being is immaterial. As we interpret the stipulated facts petitioner was not, during the taxable years, a joint adventurer under the trust instrument.

The agreement differs in some particulars from the trust. It was signed by all parties and petitioner turned over to his "associates" the options to acquire the oil and gas leases which he, at that time, owned. These facts make it necessary to examine the rule of law applied by the Circuit Court of Appeals for the Tenth Circuit in *Reynolds* v. *McMurray*, 60 Fed. (2d) 843; certiorari denied, 287 U. S. 664, and in a second appeal of the same case, the opinion in the latter instance being reported in 77 Fed. (2d) 740. The Circuit Court of Appeals for the Ninth Circuit adopted the same view in *Helvering* v. *Armstrong*, 69 Fed. (2d) 370. The cited cases hold that co-owners of oil property, who turn it over to another to operate under an agreement providing that the costs incident thereto shall be charged to the undivided interest of the owner, accounting to be made to him for his proportionate part of the oil produced, and the operator to be reimbursed by crediting the coowners' account with the operator with the proceeds from the sale of oil, thereby become joint adventurers and are taxable upon their proportion of the income. Assuming for the purposes of this proceeding that the rule is sound,[1] the inquiry must be whether it is applicable.

---

[1] The respondent has recently expressed the opinion the rule is "out of harmony" with what he believes to be the true test of ownership of income from production. G. C. M. 22730, C. B. 1941–1, p. 214, 223.

In the cited cases Armstrong and the Ohio Co. owned the oil leases. Petitioner, however, had mere options to acquire oil leases upon the terms stated therein. Under one he was required to pay $97,500 and under the other $108,000 within comparatively short periods. The property from which the oil was to be produced—the oil leases—was to be acquired, developed, and operated by Associates. That was done and Associates paid the amounts due under the options. They thereby acquired the oil leases. As we interpret the stipulated facts, including the agreement and the options, the petitioner is in essentially the same situation in so far as the agreement is concerned as he is under the trust—having assisted in the acquisition of the property he is to be remunerated by being "carried" for an undivided 10 percent interest, or, as succinctly stated in the agreement, is to be "entitled to receive 10% of the net profits accruing to Associates from the acquisition, development and operation or sale of said leases." Much that has been said above with reference to the trust is, therefore, apposite to the agreement. It may also be pointed out that petitioner is somewhat like the commercial geologist in *Schermerhorn Oil Corporation*, 46 B. T. A. 151; he merely had an interest in the net profits which it was hoped would be derived from the property. In any event, no such finding can be made under the stipulated facts as was made by the court in *Shoemake* v. *Davis, supra*, that petitioner had an interest in the oil and gas leases. It is evident the parties did not intend petitioner to have any interest in the properties until such time as his associates received a return of all their disbursements—an event which had not occurred at the end of the taxable years. The conclusion is therefore inescapable that petitioner was not a joint adventurer, either under the trust or under the agreement of July 1937.

The holding which has been made is determinative of most of the issues. In our opinion petitioner is not entitled to deduct from gross income any of the items in controversy. They did not, individually or collectively, constitute ordinary and necessary expenses of carrying on any trade or business of petitioner (sec. 23 (a), Revenue Acts of 1936 and 1938; cf. *Deputy* v. *DuPont*, 308 U. S. 488 and cases cited) ; nor did he sustain any loss in his trade or business or in a completed transaction entered into for profit (sec. 23 (e), Revenue Acts of 1936 and 1938). The portion representing depreciation may not be deducted as such by petitioner; for, so far as this record shows, he had no determinable cost basis (sec. 114 (a) and 113 (b), Revenue Acts of 1936 and 1938). Intangible drilling and development costs may be charged to capital or to expense at the taxpayer's option (art. 23 (m)—16, Regulations 94 and Regulations 101) ; but generally such items must be paid (by a taxpayer upon the cash

basis) before any option may be exercised. Where the drilling and development are done by another under an agreement payment will be made in the future out of the oil and gas to be produced, the one for whom the drilling is done has no capital improvement until a commercial well is completed. When a commercial well is completed under a contract which is, in effect, a "turn-key" contract, no option to charge drilling and development costs to expense exists, *C. W. Titus, Inc.*, 32 B. T. A. 1222, and they must be capitalized. *T. K. Harris Co.*, 38 B. T. A. 383; affd., 112 Fed. (2d) 76. This rule applies where a well is completed upon property (leasehold or otherwise) owned by the one for whom the drilling is done. It probably has no pertinency here; for in the view which we have taken, petitioner owned no property or interest in property until and unless an assignment was made to him upon fulfillment of the conditions set out in the trust and agreement.

The so-called interest charged to petitioner's account in connection with the trust is not deductible by him. It was neither paid nor incurred on indebtedness (sec. 23 (b), Revenue Acts of 1936 and 1938). It was no more than a bookkeeping entry, to be considered in determining when, if ever, petitioner would become entitled to receive the capital asset. He had borrowed no money and had made no agreement to make repayment or to pay interest. No debt existed. The obligation to pay any amount rested upon the contingency that the total earnings would exceed the total expenditures or that petitioner should see fit to acquire, by purchase, an interest in the producing wells. Neither event occurred during, or prior to, the taxable years.

Petitioner's argument upon his alternative contention is substantially as follows: If the excess of receipts over expenditures is regarded as taxable income to a joint adventurer, even though the venture may not ultimately pay out, then he should be permitted to capitalize the excess of his share of the expenses in each year over his share of the income and thus be in a position to recover ultimately the losses he will sustain through having his share of the income used to pay his share of the losses. The question is moot in this proceeding and must be passed, since petitioner was not a joint adventurer. If urged as an alternative under the stipulated facts as interpreted by us, then it may not be sustained. Petitioner had no economic interest during the taxable years in the property producing the income. At most he had an economic advantage under a contract rather than an interest in the oil in place. Such a right does not entitle him to recover, through depletion, a percentage of the drilling and development costs expended by the owner. *Palmer* v. *Bender*, 287 U. S. 551; *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362; and *Anderson* v. *Helvering*, 310 U. S. 404.

In the petition it is alleged the respondent erred in reducing the earned income credit. The charge is apparently abandoned; for no mention is made of it in the stipulation or briefs.

We are of the opinion the Commissioner committed no error in determining the deficiencies in tax. They are accordingly approved.

*Decision will be entered for the respondent.*