Puget Sound Bridge and Dredging Company v. Commissioner.
Puget Sound Bridge & Dredging Co. v. Commissioner
Docket No. 2814.
United States Tax Court
1946 Tax Ct. Memo LEXIS 201; 5 T.C.M. (CCH) 346; T.C.M. (RIA) 46104; April 30, 1946
E. L. Skeel, Esq., W. E. Evenson, Esq., H. B. Jones, Esq., and Harry Henke, Jr., Esq., 914 Insurance Bldg., Seattle 4, Wash., for the petitioner. W. H. Payne, Esq., and C. R. Maxwell, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The respondent determined deficiencies in income taxes, declared value excess-profits taxes and excess-profits taxes for the calendar years 1940 and 1941, as follows: Year
Kind of Tax
Amount
1940
Income tax
$ 13,158.48
1941
Income tax
37,043.65
1940
Declared value excess-profits
tax
8,337.75
1940
Excess-profits tax
31,961.61
1941
Excess-profits tax
216,276.04
Pursuant to the respondent's motion made prior to trial, one assignment of error made by petitioner pertaining to its claim for *202 relief under section 722, I.R.C. was dismissed for lack of jurisdiction. At the trial concessions of several of the issues raised by the pleadings were made by the respective parties, and petitioner withdrew its assignments of error relating to the treatment of income derived from Pontoon Bridge Builders, a joint venture, and to a claimed adjustment in depreciation of certain properties for purposes of determining the excess-profits tax. On brief respondent concedes that $64,630, representing a refund to the Navy Department of petitioner's share of joint-venture profits for the conversion of the U.S.S. Fuller, should be eliminated from its income for 1941. Effect will be given to these concessions upon settlement under Rule 50. The remaining issues are - (1) Did respondent properly disallow deductions claimed by petitioner as compensation to its two principal officers in the form of salaries and a fixed percentage of the net profits of the corporation to the extent of $42,340.84 for the year 1940 and $94,774.95 for the year 1941? (2) Should the petitioner's share of income from Associated Shipbuilders, a joint venture, be increased by the amounts of *203 $6,152.35 and $7,096.02 for the years 1940 and 1941, respectively, on the ground that the payments made by Associated Shipbuilders, to which these amounts are attributable, constituted capital expenditures for the purchase of the interest of Hanford Haynes in the Commercial Boiler Works, a Washington corporation? Compensation Issue Findings of Fact Petitioner is a Nevada Corporation with its principal place of business in Seattle, Washington. Its Federal income and excessprofits tax returns for the taxable years were filed with the collector of internal revenue for the District of Washington, at Tacoma, Washington. It and its immediate predecessors have been in the general contracting business for over fifty years. It keeps its books and files its returns on the accrual basis. The principal contracting business of petitioner, prior to 1939, has been its waterfront and marine work, such as dredging and filling, constructing harbor works, levees, break-waters, and docks, doing subaqueous rock removal and operating shipyards. In the contracting industry marine construction and contracting work is regarded as the most hazardous. Petitioner operated a fleet of dredges, tugs and *204 marine equipment, a marine railway, and constructed and serviced its floating plant. From 1913 through 1930, petitioner operated under the direction of three, and sometimes four, executive officers. Since that time, petitioner has operated under the direction of two officers, H. W. McCurdy and Raymond J. Huff. They became its president and vice-president, respectively, in 1931, and have continued as such to and during the taxable years. For forty years the principal executive officers of petitioner have been compensated by a fixed salary plus a commission consisting of a percentage of net income. Since 1916 the compensation has been a fixed salary plus 18 percent of net profits divided between all executive officers. It had been higher in some earlier years. The commission was limited to 18 percent in 1922 at the instance of a minority stockholder, then adverse to the management, and has been so limited since. The salary and commission method of compensation of petitioner has never been questioned by stockholders. The stockholders have known about and approved the amounts claimed as deductions for compensation of officers. On February 8, 1940 and February 10, 1941, the Board of *205 Trustees of petitioner adopted resolutions that a bonus and commission of eighteen percent of the net profits of petitioner as shown by its books for the years 1940 and 1941, and for each succeeding year until other action is taken, be paid to H. W. McCurdy and Raymond J. Huff, to be divided between them. Similar resolutions were adopted by the Board during the years 1931 to 1939 inclusive. The acts of the officers and trustees were approved and ratified by the stockholders at their annual meetings. In 1929, when McCurdy and Huff were originally engaged to take over the executive management of petitioner, Huff owned ten shares of its stock and McCurdy owned few, if any shares. They entered upon this employment at the persuasion of the representative of the holders of more than 85 percent of the stock. At the stockholders' meeting of February 8, 1940, McCurdy and Huff owned outright, held under options to purchase from the petitioner or others, and held proxies and voting rights to an aggregate of 2,037 and 1,446 shares, respectively, or a total of 3,483 out of the 5,495 shares outstanding. At the meeting of February 8, 1941, McCurdy and Huff owned outright, held under options, *206 and held proxies and voting rights to an aggregate of 2,037 and 1,485 shares, respectively, or 3,522 out of a total of 5,495 shares outstanding. From September 10, 1941 to the end of that year they owned or held under option 2,791 shares. Commencing with the letting of the large public works contracts for such projects as Boulder Dam and Grand Coulee Dam, it became impossible for contracting companies to bid alone for such business. Bonding companies would not write bid bonds or performance bonds for any single contractor on such projects. No single contractor could finance work on that scale or justify taking the risks of a contract out of all proportion to other pending work. The result was that several contractors would have to submit a joint bid, with their combined resources. This they could do, and in some early cases did, by forming a new corporation for the particular project, in which each would have an interest. To assure equal voice in the contract work and to avoid creating a new corporation, several contractors could also submit a joint bid on which they would be jointly and severally responsible, and, if successful, they entered into a joint venture agreement. When *207 Congress, in April, 1939, for the first time authorized cost-plus-fixed-fee contracting for certain large naval defense projects for Alaska, the Pacific Islands and the Carribean (Public Law No. 43, 76th Congress, approved April 25, 1939), it became possible for the Navy to engage responsible contractors for extremely large projects for a fixed-fee, without the delay of preparing specific plans, specifications and conditions on which to invite and study bids. In practice, this led to a careful scrutiny and a survey of all the contractors in the industry and even then the awards were, as a matter of policy, made to several contractors jointly and severally, usually three or more in number, so that the Government had the benefit of responsibility of each for the entire job. It is the practice and custom of the industry in joint contracting and joint ventures not to divide administration of the work of performing joint contracts. Usually, one of the joint contractors is on the scene, or most experienced in the particular work or location or best equipped with plant or personnel for the kind of work involved. Normally, that particular one of the joint contractors is the "sponsor". *208 In 1940 and 1941, the major portion of petitioner's contract work was by participation in several joint ventures for large public works. The names used to describe these ventures were "Pontoon Bridge Builders", "Siems Drake Puget Sound", and "Associated Shipbuilders". Petitioner was the sponsor in the "Pontoon Bridge Builders" contract for the Lake Washington Floating Bridge and in the largest public works contract for the Alaska Naval Air Bases, carried out by "Siems Drake Puget Sound." In 1939 and 1940, petitioner, as the sponsor-contractor in the "Pontoon Bridge Builders" venture prosecuted the construction of the Lake Washington Floating Bridge, a unique and world-renowned structure, and the largest floating structure ever built. The "Siems Drake Puget Sound" venture handled the construction of Naval Air Bases in Alaska for the Navy Department. This project was conceived in the summer of 1939 as a $12,000,000 job for Sitka and Kodiak, to be completed within three years. It actually took four years, and expanded to many locations, but because of an enlarged program involved a gross expenditure of approximately $128,000,000. By the end of 1940, the contractors had done $9,000,000 *209 worth of work, and by the end of 1941 they had completed $50,000,000 worth of work. At the direction of the Navy, none of the Alaska work was sublet or subcontracted. Every trade and craft was employed; entire cities were built; every character of structure erected; and practically all the personnel, supplies, materials and plans were procured, arranged for, crated and shipped to Alaska. The Alaska construction was on a magnitude sufficient to provide housing to cover 100 square city blocks, accommodate a city of 30,000 people, with installed power facilities sufficient to generate enough electricity for a city of approximately 100,000 people, with 1,400 miles of paved roads, and all other construction in proportion. The work extended throughout the Aleutian Islands to Attu. The members of this joint venture were Siems-Spokane Co., St. Paul, Minn., Johnson, Drake & Piper, Inc., Minneapolis, Minn., and petitioner. Each of the participants had a one-third interest. The "Associated Shipbuilders" venture started operations in September, 1940, and by the end of that year there were about 1,200 men on the payroll, and about $1,000,000 worth of work was complete. By the end of 1941, about *210 2,100 men were on the payroll, and about $7,000,000 worth of work was complete. In this venture, the petitioner, which had land and graving docks on Harbor Island suitable for the construction of steel hulls, and the Lake Union Dry Dock & Machine Works, which had cranes and machinery suitable for installing machinery and outfitting hulls, consolidated their facilities to make an effective shipyard. This venture engaged in the construction of lighters, tenders and minesweepers. The joint venture agreement provided that each "of the parties shall have an equal one-half interest in this joint venture and each shall be entitled to one-half of the profits * * *." In addition to its activities as a member of these joint ventures, petitioner, during the years 1940 and 1941, engaged in other contracting operations, such as construction of airports, dredging, operating a rock quarry, subaqueous rock removal work in Alaska and on the Columbia River, construction of the Richfield Oil Terminal, rock removal in Seymour Narrows for the Canadian Government, and, as a partner with Rumsey & Co., construction of a large pier at Puget Sound Navy Yard. In all of these activities, whether participated *211 in by petitioner alone or as a member of a joint venture, McCurdy and Huff performed many and varied duties as executive officers of petitioner or of its board of trustees during the taxable years. McCurdy, a licensed professional engineer highly regarded in his profession and in the construction industry, has worked in the waterfront and marine contracting industry since boyhood. During 1940 and 1941 he performed the executive duties of president and general manager of petitioner, was in charge of its operations, assisted in the negotiations for and procuring of contracts; and served as representative of all of the contractors on the Siems Drake Puget Sound venture. In connection with this venture he handled such matters as the development of an engineering department and a power plant design department, the negotiation of basic labor contracts with unions, the development of a personnel department to recruit 100,000 men throughout the United States and arrange for their transportation, basic contracts for essential materials and equipment, and arrangements for reconditioning and using steamships for dormitories, galleys and power plants. He was also a representative of petitioner *212 on an executive committee for the Associated Shipbuilders venture, and all shipbuilding at the Harbor Island plant was under his direction. He also participated in the direction of those activities of petitioner which were not related to the joint ventures. Huff has had a long and varied experience working for firms in the construction business. He became petitioner's office manager and chief accountant in 1914, its secretary in 1923, a member of its board of trustees and its treasurer in 1929, and its vice president in 1931. His work for petitioner and the joint ventures in 1940 and 1941 included management of its offices, records, accounting, financial transactions, taxation, insurance, contractual matters, administration of its physical properties and investments, sales of property, and the arrangement and handling of the working capital requirements of petitioner and ventures it managed. He also acted for petitioner and the joint ventures which it sponsored in conforming to multitudinous laws, regulations, rules, business practices, insurance practices, taxation, and government regulations. Petitioner's share of the net profits of the joint ventures in which it participated *213 in 1939, 1940 and 1941, as reported in its income tax returns for those years, was as follows: Pontoon Bridge Siems Drake
Associated
Miscellaneous
Year
Builders
Puget Sound
Shipbuilders
Ventures
Total
1939
$69,497.36
$ 5,970.04
$75,467.40
1940
24,086.24
70,026.38
$116,894.83
915.23
211,922.68
1941
1,956.09
322,114.37
34,824.41
65,042.83
423,937.70 The net income from all sources, reported in petitioner's returns for 1939 was $32,655.65, for 1940 - $227,700.98, and for 1941 - $359,280.55. The following table shows petitioner's total gross business, net income exclusive of compensation, profit transferred to surplus, and investment or net worth for the years 1929-1941: Net income
Profit
Investment (Net
Total Gross
exclusive of
transferred
Worth) Begin-
Year
Business
compensation
to surplus
ning of year
1929
$ 986,318
$153,293.28
$125,743.28
$1,377,272.00
1930
1,500,255
157,785.91
111,488.45
1,051,728.43
1931
1,704,943
197,797.76
144,564.16
1,164,123.29
1932
452,098
Loss
1,310,324.54
1933
256,913
Loss
1,287,894.24
1934
1,586,496
Loss
1,232,662.44
1935
171,371
Loss
1,251,091.38
1936
386,298
61,875.21
31,057.67
1,202,014.88
1937
575,122
40,880.18
10,271.20
1,208,444.41
1938
807,251
Loss
1,216,571.67
1939
752,817
62,831.07
31,264.83
1,165,526.55
1940
4,926,658
301,267.12
227,359.04
1,196,791.38
1941
18,981,217
592,562.14
466,220.95
1,262,934.55
*214 The amounts shown under the heading "Total Gross Business" for the years 1939, 1940 and 1941 include petitioner's proportionate share of the gross business of the several joint ventures in which it participated, and the amount shown under the head "Net Income exclusive of compensation" for these years include petitioner's distributive share of the net profits of these ventures. The amount of dividends paid by petitioner from 1913 through the year 1941 was as follows: 1913
$ 33,000.00
1914
33,000.00
1915
170,500.00
1916
203,500.00
1920
16,500.00
1921
71,440.00 (property)
1925
19,250.00
1926
19,250.00
1936
16,485.00
During the years 1924 to 1933 inclusive, the fixed salary Huff received from petitioner as compensation for services ranged from $3,600 to $10,750 per anuum, and during the years 1928 to 1933 inclusive, the fixed salary of McCurdy ranged from $3,300 to $10,750 per annum. From 1934 to 1941 inclusive, each of these officers received a fixed salary of $12,000 per annum. The commissions received by them during the years 1929 to 1941, inclusive, were as follows: Huff
McCurdy
1929
$ 5,000.00
$ 5,000.00
1930
12,248.73
12,248.73
1931
15,866.80
15,866.80
1932
1933
1934
1935
1936
3,408.77
3,408.77
1937
3,304.49
3,304.49
1938
1939
3,783.12
3,783.12
1940
24,954.04
24,954.04
1941
51,170.59
51,170.60
*215 In addition to the salary and commissions paid McCurdy and Huff during the years 1940 and 1941, and claimed as deductions by petitioner, they each received the following amounts as compensation from joint ventures: Associated
Siems Drake
Shipbuilders
Puget Sound
1940
$ 5,000
1941
10,000
* $7,083.33 In the partnership returns filed by these joint ventures for the years 1940 and 1941, the amounts paid to McCurdy and Huff were deducted in arriving at the shares of net profits distributable among the joint venturers. These amounts were paid for services rendered by these two men as representatives of the ventures and in managing and directing them. In its income tax return for the years 1940 and 1941, the petitioner deducted as ordinary and necessary business expenses the amounts of the salaries paid to McCurdy and Huff in those years, viz., $73,907.08 for 1940 and $126,341.19 for 1941. The respondent determined that $15,783.12, the amount petitioner claimed as a deduction in 1939 for compensation paid to each of these *216 men, or $31,566.24 for both, represented a reasonable allowance for salaries or other compensation for services actually rendered by them, and he disallowed the deduction of the excess amounting to $42,340.84 in 1940 and $94,774.95 in 1941. Reasonable compensation for services rendered by McCurdy and Huff to petitioner was $59,740.42 in 1940 and $96,341.19 in 1941. Opinion The respondent contends that he properly disallowed deductions to the extent of $42,340.84 for the year 1940 and $94,774.95 for the year 1941, representing a portion of the deductions taken by petitioner in the taxable years as compensation for services of its two principal officers which was paid in the form of fixed salaries plus a percentage of the corporation's net profits. In support of his contention, he urges that increased profits due primarily to national defense and war activities do not constitute a sound basis for increasing compensation to officers; that the Siems DrakePuget Sound and Associated Shipbuilders ventures, from which a large share of petitioner's profits were derived in the taxable years, were engaged exclusively in war production or the construction of defense or military installations; *217 that the payment of compensation under agreement does not necessarily render it an ordinary and necessary expense within the meaning of the statute; that the amounts paid to McCurdy and Huff by petitioner are not "reasonable" in relation to the work required or services performed by them in petitioner's own business and separate activities, apart from the joint ventures; and that the compensation paid to McCurdy and Huff by petitioner for services rendered on behalf of the separate joint ventures does not constitute an ordinary and necessary expense of the petitioner. Petitioner contends that the deductions claimed for compensation paid to McCurdy and Huff were ordinary and necessary business expense for services actually rendered, and were reasonable in amount. Whether compensation paid to officers of a corporation for services rendered is or is not reasonable is a question of fact. Where as here the respondent has disallowed as a deduction a part of the amount paid to officers as compensation, the burden is upon the petitioner to overcome the prima facie correctness of the respondent's *218 determination. The evidence introduced by petitioner to sustain this burden is voluminous. It has proved to our satisfaction that its uniform policy for forty years has been to pay its executive officers a fixed annual salary, plus a percentage of net profits; that the majority stockholders held out the compensation policy to McCurdy and Huff to induce them to accept their positions; that the method of compensation used by it for its executive officers is standard and customary in the contracting industry; that McCurdy and Huff were specially able and qualified for their positions; that at the time they were employed petitioner's affairs had reached a low ebb and under their management and guidance it gradually progressed until it became an outstanding member of the industry and a company of substantial worth and earning capacity; that its compensation policy has been approved by its stockholders and is in line with that of other contractors engaged in similar enterprises; and that the time McCurdy and Huff devoted to their duties and the burden, strain and responsibility on them substantially increased in 1940 over prior years, and was greater in 1941 than in 1940. A witness for *219 petitioner, who had been in the general construction business for 41 years, principally in southern California, and who now is the president of Pacific Constructors, Inc., the builders of Shasta Dam, and a partner in a construction company engaged in marine work, testified that the fixed salary, plus a share of the profits, was a customary method of compensating for services in the construction business; that it provides executives with an incentive to not only work for themselves but also for the company; that it puts the company in a better position to meet competition and stay alive in tough years; and that it should also work in the years when the company meets with success. He recited a number of instances in which the executive officers, managers and superintendents of contracting enterprises received compensation based in part upon a percentage of net earnings. Thus, he stated that the general superintendent on the Shasta Dam project was paid by Pacific Constructors, Inc., a minimum of $18,000 a year plus 2 1/2 percent of net profits, and that he may be employed on Boulder Dam with the same participation in earnings; that the head man on the contract for the Third Locks at the *220 Panama Canal was hired by Nevada Contractors, Inc., for $2,500 a month plus 10 percent profits; and that the president of one of the competitors of the Marine Construction department of petitioner is compensated on the basis of $1,000 per month and 20 percent of the profits. He had personal knowledge of the ability and qualifications of McCurdy and Huff and stated that they had a very high reputation in the construction industry. According to the witness it might be possible to get men having experience and ability in the contract field for a fixed salary of $15,000 or $20,000 per year, but it would not be possible to keep them because someone else would offer them larger and better earnings. He expressed the opinion that the sum of $36,953.54 paid to McCurdy and Huff in 1940, and the sum of $63,170.59 paid to each of these men in 1941, constituted reasonable compensation for services rendered by them during those years. In William S. Gray & Co. v. United States, ( Ct. Cls.), 35 Fed. (2d) 968, the court made the following pertinent statement: The policy of agreeing to pay a percentage of the earnings before they are earned, or even a sum in the nature of a bonus after *221 they are earned, is based primarily upon sound business principles. It stimulates the activity, diligence, and ambition of the employees in the case of a percentage of the profits, and in both the case of a percentage and of a bonus it enables the corporation to justly compensate its employees without beforehand incurring the obligation. The respondent in his promulgated regulations has recognized that the fact that all or part of an individual's compensation is paid on a contingent basis does not ipso facto justify a conclusion that it is unreasonable. Article 19.23(a)-6 of Regulations 103 provides in part as follows: (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual *222 made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. The evidence discloses that in the period 1929 to 1939, petitioner, under McCurdy and Huff, liquidated its frozen assets, eliminated or discharged heavy direct and contingent liabilities, rehabilitated its plant, and developed contracting and construction work to a profitable basis, surviving the depression years with better success than average for *223 the industry. For these efforts McCurdy and Huff did not reap any substantial rewards from the percentage of profits provision until the year 1940. That national defense and war activities were in a measure responsible for petitioner's profits in 1940 and 1941 cannot be denied. We do not think it unreasonable, however, that McCurdy and Huff received a percentage of these profits as compensation. They had a very good reputation in the construction industry and the knowledge that they would supervise any work allotted to petitioner undoubtedly played an important part in putting petitioner in a position to realize profits. While national defense and war activities increased the income of petitioner, they also increased greatly the duties and responsibilities of McCurdy and Huff and as a result they worked long hours every day of the week. Bearing in mind the nature and character of the work done by them, their qualifications, ability, and the uniformity and long acceptance of the salary and percentage plan of compensating them, both by the corporation and its stockholders, we are convinced that the compensation deductions claimed would constitute reasonable compensation if all of their *224 services and time had been devoted to petitioner during the taxable years. The evidence convinces us that a substantial part of the services of McCurdy and Huff during the taxable years were rendered for the petitioner either in connection with activities conducted by it in its own behalf or in connection with its activities as a member of the joint ventures. We are also convinced that much of their time and efforts during these years was devoted to work which was not performed for petitioner alone, but was rendered for each venture as a whole. Thus, it appears that both McCurdy and Huff acted in a representative capacity for each venture, were active in the management of each, and were called upon to decide questions of policy. For these services in 1940, they each received from the ventures the sum of $7,083.33, and in 1941, each received the sum of $15,000. While we would be inclined to approve the compensation paid to each of these men by petitioner in 1940 and 1941 as reasonable if their entire time and services had been devoted to activities conducted by it in its own behalf or in, connection with its activities as a member of joint ventures, we think it was excessive for the *225 part-time service they actually rendered to petitioner. We have, therefore, concluded that some adjustments should be made in the compensation paid to them by petitioner, and it is our best judgment, and we have found as a fact, that reasonable compensation for services rendered by McCurdy and Huff to petitioner was $59,740.42 in 1940 and $96,341.19 in 1941. These amounts are deductible as ordinary and necessary business expenses by petitioner. The Haynes Issue Findings of Fact Under date of September 15, 1940, petitioner and the Lake Union Dry Dock & Machine Works entered into a joint venture agreement covering their equal participation in joint work to be performed for the United States Navy under the name of Associated Shipbuilders. One of the earliest contracts was for steel lighters, the materials for which were fabricated at the plant of a separate corporation known as the Commercial Boiler Works. This corporation did not own its land or buildings, but had a plant equipped with machinery for cutting, bending, rolling and handling steel plate. Forty-nine percent of its stock was owned by the Fox Estate and 51 percent by Hanford Haynes, who was its president and manager. *226 Associated Shipbuilders had need for the equipment in the plant of the Commercial Boiler Works, and for the services of Haynes. The Fox interests, consisting of 49 percent of Commercial Boiler Works stock, and approximately $41,000 in other claims against the corporation, were purchased by Associated Shipbuilders in September, 1940, for $28,900. Negotiations were entered into by representatives of Associated Shipbuilders with Haynes for his stock interest in Commercial Boiler Works and for his services, and an agreement, dated November 20, 1940, was executed wherein, after stating that the party of the second part (Associated Shipbuilders) desired to buy the interest of the party of the first part (Haynes) and that the party of the first part was willing to sell said interest, the parties entered into the following agreement: 1. The party of the second part agrees to buy and the party of the first part agrees to sell fifty-one per cent (51%) of the common capital stock of the Commercial Boiler Works, consisting of five hundred ten (510) shares of said stock, and the said party of the first part does by these presents sell, assign, transfer and set over all of his said interest *227 in said corporation, including said stock. 2. The party of the second part agrees to pay to Hanford Haynes for said stock five per cent (5%) of the net profits of the joint venture hereinbefore referred to, said payments to be made at the same time as profit distribution is made to the members of the joint venture. 3. The party of the second part has inspected the physical properties and assets of Commercial Boiler Works, including machinery, fixtures, and the like, and accepts them as is, where is; but party of the first part has furnished to party of the second part a financial statement as of October 1st, 1940, for said Commercial Boiler Works, which, to the best of his knowledge and belief, is correct and it is therefore assumed by the parties to be a substantially correct and accurate statement. 4. In the event party of the second part should discontinue its joint venture and liquidate the same, party of the first part shall receive fifty-one per cent (51%) of the amount received in liquidation for those items of equipment listed in the "Bean Appraisal" of Commercial Boiler Works equipment, which appraisal bears date the 14th day of September, 1940, and the party of the *228 second part shall have the right and option to retain said items of equipment and any thereof and pay party of the first part fifty-one per cent (51%) of a fair liquidating value for the items retained. 5. In the event of the death of the party of the first part of the termination of his employment by second party for any reason, the option is herewith given to second party, Associated Shipbuilders, to purchase from the heirs, administrators or executors of the party of the first part, the party of the first part's rights under this contract for the sum of Twenty Thousand Dollars ($20,000.00) cash. * * * * *
7. "Net profits", as defined herein, shall mean those sums over and above the expense of operating a venture of this character and shall be computed in the same identical manner as the profit distribution of the venture, in accordance with the books and records of the venture. 8. Other than the foregoing, the said party of the first part has no interest in the assets or liabilities of the party of the second part, nor in those of the individual corporate members of second party. The profits of the joint venture in which party of the first part is entitled to share, in *229 accordance with Paragraph 2, and the losses of the joint venture to be used in computing the sums payable by party of the first part in accordance with Paragraph 11, shall be confined to such as arise from operations of the joint venture in the existing three plants, to-wit, the West Waterway Plant, the Lake Union Plant, and the plant of Commercial Boiler Works, and party of the first part shall have no interest in or responsibility for the work, assets, liabilities, profits or losses at any new or other plant. 9. Party of the second part shall at all times have access to the books and records of said joint venture and shall receive at periodic intervals not less than quarterly, statements indicating the correct financial position of the venture, in accordance with the books and records of the venture, and shall be the same as statement furnished to each member of party of the second part. 10. Party of the second part agrees to employ party of the first part and the latter agrees to work for the former at a salary of not less than Five Hundred Fifty Dollars ($550.00) per month, commencing September 20, 1940, for a minimum period of one (1) year therefrom, if said party of the first *230 part is able so to do. 11. Should there be no profits, but instead a loss sustained by the joint venture, party of the first part agrees to pay to party of the second part a sum equal to five per cent (5%) of such loss, but not exceeding, in any event, Twenty Thousand Dollars ($20,000.00), against which liability shall be offset the sum to which first party may become entitled under Paragraph 4 hereof. Equipment of Commercial Boiler Works was taken from its old plant, dismantled and parts set up in the new Harbor Island plant of Associated Shipbuilders. Haynes became a plant superintendent at the shipyard. He was paid $550 each month and was credited with 5 percent of the net profits of Associated Shipbuilders for 1940 and 1941, against which he drew from time to time. Haynes joined the Navy in March, 1942. Haynes' 5 percent of profits and of losses was estimated for the fractional year and a compromise and settlement reached as to Haynes' share of the profits and losses to the time of the termination of his employment. Haynes received his 5 percent participation by five checks as follows: February 28, 1941
$ 3,000.00
June 27, 1941
2,900.00
January 9, 1942
1,000.00
March 10, 1942
6,000.00
September 12, 1942
11,266.34
*231 Haynes was allowed 5 percent of profits on all contracts except one on which he was charged with 5 percent of the loss. He was paid his fixed monthly salary to the time he left, and also the sum of $20,000. After the Commercial Boiler Works plant was installed as a part of the facilities of Associated late in 1940, a charge of $1,500 per month was made by Associated against the Government for its use. This amount was also charged by Commercial Boiler Works against Associated as rental, and deducted by Associated as an expense of doing business. For the year 1941 Commercial Boiler Works included in its income tax return as income the sum of $25,700 for the use of its equipment and as subrental for a building which it had under lease. Associated Shipbuilders filed partnership returns for 1940 and 1941, in each of which it showed the distribution of net income in the proportion of 47 1/2 percent to petitioner, 47 1/2 percent to Lake Union Dry Dock & Machine Works, and 5 percent to Hanford Haynes. The amount of the 5 per cent shown distributable to Haynes for 1940 was $12,304.71, and the amount shown distributable to Haynes in 1941 was $14,192.04. Petitioner took into its returns only *232 the 47 1/2 percent of Associated Shipbuilders earnings shown in the Associated Shipbuilders returns. The respondent determined that the amounts paid to Haynes in each year were capital expenditures and represented part of the purchase price of the Commercial Boiler Works stock. The returns of Haynes for the years 1940, 1941 and 1942 were prepared by his lawyer. The original 1940 return was prepared by the latter without making any examination of the contract between Haynes and Associated, but merely upon information that Haynes had received salary and a percentage of profits from Associated. Upon that information the profits were included in the 1940 return as a distribution of partnership earnings. Later, after the lawyer had examined and studied the agreement, he decided that he had made an error in so treating the profits and filed an amended return for 1940, reporting the amount of the profits as longterm capital gains from the sale of the stock. The profits so received in 1941 were for the same reason reported as long-term capital gain. On March 24, 1942, the following letter was addressed to Haynes by Associated Shipbuilders: This will confirm our statement that Associated *233 Shipbuilders have elected as of this date to terminate all of your rights under our contract of November 20, 1940. We are herewith paying you the sum of Twenty Thousand and no-100ths Dollars ($20.000.00), receipt of which you acknowledge, and you agree that full payment has been made to you of the purchase price of the Five Hundred and Ten (510) shares of stock of Commercial Boiler Works, referred to in said contract. Your salary to April 1, 1942, will be paid in cash, and as additional compensation for your services you are entitled to Five Percent (5%) of the net profits of Associated Shipbuilders to this date less payments previously made. This additional payment will be made to you at or before the time when any profit distribution is made to Lake Union Dry Dock & Machine Works and Puget Sound Bridge & Dredging Co., the members of the joint venture. This terminates our contract relations with you, and except as provided in this letter neither has any rights or claim against the other, this being a complete and general settlement of all matters between us to this date. All of your benefits under this letter shall inure to your executors, administrators, successors and assigns. *234 Yours very truly, ASSOCIATED SHIPBUILDERS, By PUGET SOUND BRIDGE & DREDGING CO. By H. W. McCURDY - Pres. By LAKE UNION DRY DOCK & MACHINE WORKS By H. B. Jones V. P. & Secy. ACCEPTED: Hanford Haynes HANFORD HAYNES On June 11, 1942, the Internal Revenue Agent in Charge at Seattle, Washington, wrote to petitioner advising it that after consideration by his office a number of adjustments of its tax liability for the years 1940 and 1941 appeared to be warranted. One of the adjustments related to the distributions made by the venture to Haynes in each of these years and resulted from the holding of the agent that Haynes was not a member of the venture and that the percentage of profits credited to him in each year was a payment on the purchase price of his stock. On September 11, 1942, Haynes addressed to Associated Shipbuilders the following letter: We have discussed the matter of the compensation to which I may be entitled to the date of severance of our relationship and the uncertainty of computing it now. We have, accordingly, endeavored to arrive at a compromise settlement agreement. This letter will, therefore, evidence our agreement that you will pay to me, and I will *235 accept, $11,266.34 in full satisfaction of all my claims for compensation, present or prospective. My contract of employment is now terminated. Very truly yours, Hanford Haynes HANFORD HAYNES Accepted and agreed to Sept. 11, 1942 ASSOCIATED SHIPBUILDERS BY: H. B. Jones BY: H. W. McCurdy
The payment of $20,000 by Associated to Haynes in 1942 was reported by Haynes to his lawyer as a closing-out of his interest in Commercial Boiler Works. The amount was treated by the lawyer and Haynes as a sale of Haynes' rights under the contract. The rebate or loss in the amount of $2,305.42 was deducted from the $20,000, leaving a net income from that source of $17,694.58 for the year 1942. Opinion The petitioner contends that Haynes was a partner in the Associated Shipbuilders' venture; that the 5 percent of the profits distributed to him are not taxable to it and Lake Union; and that the 5 percent of Associated's profits paid to Haynes in 1940 and 1941 were for services and had nothing to do with the purchase of his 51 percent stock interest in Commercial Boiler Works. The respondent contends that Haynes did not become a partner in the joint venture; that he acquired no proprietary *236 interest in the business but only the right to share in the net profits; that he was separately paid for his services; and that the 5 percent of the net profits paid to him constituted, in part, consideration for the stock interest in Commercial Boiler Works which he sold and immediately transferred to Associated. Respondent urges, therefore, that the amounts paid Haynes constituted capital expenditures by the venture, no part of which may be eliminated from its net income during the taxable year. Respondent's position is that the entire distributive income of the venture belonged to petitioner and Lake Union and each of them is required to include its full 50 percent in their respective returns, undiminished by the 5 percent profit paid to Haynes as part of the consideration for the acquisition of his stock in Commercial Boiler Works. In Donald P. Oak, 46 B.T.A. 265, 271, this Court said: The cases * * * seem to hold that whether a joint adventure exists is a mixed question of law and fact, depending, in no small degree, upon the intention of the parties. First Mechanics Bank of Trenton v. Commissioner, 91 Fed. (2d) 275. *237 In resolving it the instruments signed by the parties, if unambiguous, are entitled to great weight, but consideration may also be given to the circumstances under which they were executed, the objects sought to be accomplished, and any and all facts showing or tending to show what their actual intention was. * * * There is nothing ambiguous in the wording of the agreement of November 20, 1940. After stating that Haynes is the owner of 51 percent of the capital stock of the Commercial Boiler Works; that Associated Shipbuilders, the owner of 49 percent of the stock of that corporation, desires to buy the 51 percent interest of Haynes; and that Haynes is willing to sell his interest, the parties agreed that Associated Shipbuilders should pay Haynes for his 510 shares of Commercial Boiler Works five percent of the net profits of the joint venture; that, in the event the joint venture was discontinued or liquidated, Haynes should receive 51 percent of amount received in liquidation for items of equipment; that, in the event of death of Haynes or termination of his employment, Associated should pay $20,000 for his "rights under the contract"; that Associated should employ Haynes and he *238 should work for Associated at a salary of not less than $550 per month, commencing September 20, 1940, for a minimum period of one year; and that, if a loss was sustained by the joint venture, Haynes would pay Associated 5 percent of such loss. Petitioner's contention that 5 percent of the net profits of Associated was paid for the services of Haynes and not for his stock is contrary to the provisions of the written agreement. No evidence was excluded on the ground that it was parol evidence tending to vary the terms of the written agreement, and petitioners attempted to prove that the actual agreement of the parties was different from that expressed in their written contract. The three signers of the agreement were H. W. McCurdy on behalf of petitioner, J. L. McLean on behalf of Lake Union, and Haynes. The only one of them who testified at the trial was McCurdy. At that time Haynes was in the United States Navy and not available as a witness, and McLean had died. McCurdy testified that in his negotiations with Haynes it was understood that after the Fox interests were acquired Haynes would come over to Associated; that Associated would remove such of the equipment of Commercial *239 Boiler Works as it wished to Harbor Island and Haynes "would take five percent interest in the profits of the joint venture called the Associated Shipbuilders, - not ownership in the joint venture." He further testified: * * * And then he said he wanted a salary for his services and a commission, - a percentage, - and I said that we would want to be in a position to discharge him at any time we would desire, and that the only obligation we would have would be to pay him a minimum of $20,000 for his stock. plus his salary up to the time he was discharged, and five per cent of the net profits until he was discharged, or quit, or left. McCurdy also testified that others connected with Associated had discussions with Haynes; that the agreement was brought to him by Mr. Huff; that he did not know who drew up the agreement; and that he assumed at the time it was executed that "it was what we had agreed upon". That a high-salaried officer of a corporation, such as McCurdy, would have signed an agreement such as that of November 20, 1940, without thoroughly digesting its contents is hard to believe. It is also difficult for us to conceive that McLean and Haynes also would have signed *240 this agreement which had as its principal objective the acquisition by Associated of Haynes' stock in the Commercial Boiler Works and which contained the specific provision that 5 percent of the net profits of the joint venture should be paid "for said stock" if their understanding was that 5 percent of the net profits was to be paid for Haynes' services. There is every indication that the agreement was drafted with great care by a member of the legal profession. Had he been produced as a witness, he might have shed considerable light on the source of the data which he incorporated in the written agreement, and whether he read it to the signatories or whether they read it themselves before affixing their signatures. Proof that the stock of Commercial had no value at the time the agreement was executed would be some indication that the 5 percent of the net profits was not paid to Haynes for stock ad must have been paid for services, but the statement of McCurdy that the Commercial Boiler Works was in bad financial condition at that time does not prove that the stock had no value. This statement is not supported by any evidence of the actual value of the assets of the corporation as *241 compared with its liabilities. Some idea of the value of its assets might have been ascertained if the appraiser who made the so-called "Bean Appraisal" of its equipment, dated September 14, 1940, had been called as a witness, and the financial statement of October 1, 1940, had been introduced in evidence. They were not, however, and the evidence introduced leaves with us the feeling that Haynes' stock had some substantial value on November 20, 1940. In this connection, we deem it quite significant that after the Commercial Boiler Works plant was installed as a part of the facilities of Associated late in 1940, a charge of $1,500 per month ($10,000 a year) was made by Associated against the government for its use. This amount was also charged by Commercial against Associated as rental, and deducted by Associated as an expense of doing business. For the year 1941 Commercial reported as income for the use of its equipment and as subrental for the building which it had under lease a total of $25,700. The evidence as a whole does not establish that the actual agreement of the parties was different from that which is expressed in their written contract. In reaching this conclusion, we *242 have not overlooked Associated's letter of March 24, 1942, to Haynes, and the latter's letter of September 11, 1942 to Associated. Suffice to say that they do not convince us that Haynes, whose stock in Commercial was acquired by Associated in 1940, according to a statement contained in Commercial's income tax return for that year, then transferred title to his stock in exchange for a promise to pay $20,000 when he died or otherwise terminated his employment. Our best judgment is that the agreement between the parties was that Haynes would sell his Commercial stock to Associated in 1940 in consideration for Associated's promise to pay him 5 percent of its net profits during the period he was employed by it, that he or his heirs would be paid for his rights under the contract upon termination of his employment, by death or otherwise, the sum of $20,000, and that he would be paid not less than $550 per month for his services. The respondent did not err in his determination that the percentage of the profits of the Associated Shipbuilders' venture paid to Haynes during the taxable years constituted capital expenditures, no part of which should have been eliminated in computing petitioner's *243 share of the net profits of that venture. Decision will be entered under Rule 50. Footnotes
*. $2,083.33 of this amount was paid for services rendered during the portion of the year 1940 from August to the end of the year.↩