**DIKE et al. v. MARTIN et al.**

No. 10529—Opinion Filed Feb. 21, 1922.

(Syllabus.)

**1. Evidence—Contracts—Oral Negotiations —Writing.**

Where preliminary negotiations are consummated by a written agreement, or an oral contract is evidenced by a subsequent agreed memorandum in writing, the writing supersedes all previous understandings, and the intent of the parties must be ascertained therefrom. However, in case of

doubt as to its meaning, all the negotiations between the parties ought to be considered in giving a contract construction.

## 2. Same—Parol Evidence — Agreement Subsequent to Written Contract.

The rule forbidding the admission of parol or extrinsic evidence to alter, vary, or contradict a written instrument does not apply so as to prohibit the establishment by parol of an agreement between the parties to a writing, entered into subsequent to the time when the written instrument was executed, notwithstanding such subsequent agreement may have the effect of adding to, changing, modifying, or even altogether abrogating the contract of the parties as evidenced by the writing.

## 3. Joint Adventures—Fiduciary Nature of Relation.

The relation between parties to a joint adventure is fiduciary in its character, and requires the utmost good faith in all the dealings of the parties with each other.

## 4. Same—Consideration—Mutual Promises.

A contract of joint adventure is sufficiently supported by a consideration growing out of the mutual promises of the parties.

## 5. Same — Mining Investment — Advancement by One Party as Loan.

Where six persons enter into an agreement to acquire a mining lease in equal interests, five of such persons to furnish money and the other to contribute his services and experience in superintending the work of prospecting such lease, money advanced for such prospecting by the one contributing his services and one of the others, without giving the other four an opportunity to participate, will be considered in the nature of a loan to the joint adventure, and for the benefit of the joint adventurers.

## 6. Same — Termination of Relation—Refusal of Party to Perform.

If either party to a joint adventure has refused to substantially perform his obligations, his associates may terminate their relations with him and carry out the enterprise to his exclusion, and if for this, or any other valid reason, they choose to terminate the relationship, they could do so only by giving notice to him that the relationship was then and there ended.

## 7. Same—Fraudulent Acquisition of Property by One Party — Constructive Trust in Favor of Others.

Where one party to a joint adventure obtains the title to property, not only by fraud or by violation of confidence, or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain it against his coadventurers, equity carries out its theory of a double ownership, equitable and legal, by imposing a constructive trust upon the property in favor of the one who in good conscience is entitled to it, and who is considered in equity as the beneficial owner thereof, or of an interest therein.

## 8. Trusts—Constructive Trusts — Frauds, Statute of.

Constructive trusts, being created by operation of law, are not within the statute of frauds.

## 9. Appeal and Error — Review of Equity Case—Sufficiency of Evidence.

In equitable actions, the judgment of the trial court will not be set aside unless it is clearly against the weight of the evidence.

## 10. Same.

Record examined, and held, that the judgment of the trial court is not against the clear weight of the evidence.

Error from District Court, Ottawa County; A. C. Brewster, Judge.

Action by E. A. Martin and others against C. F. Dike and others to recover mining interests. Judgment for plaintiffs, and defendants bring error. Affirmed.

A. Scott Thompson and Leslie J. Lyons, for plaintiffs in error.

Grover C. James and Vern E. Thompson, for defendants in error.

NICHOLSON, J. This suit was instituted by E. A. Martin, W. L. Martin, John F. Martin, and Perry Webster, as plaintiffs, against C. F. Dike, W. M. Smith, and O. L. Picher, as defendants, the plaintiffs praying that the court decree them to be the owners of an undivided one-sixth interest each in certain mining rights and a certain contract for a lead and zinc mining lease covering 40 acres of land in Ottawa county. The trial court found for the plaintiffs and entered the decree as prayed for, to reverse which the defendants have prosecuted this appeal. For convenience, we will refer to the parties as they appeared in the lower court.

The facts, as disclosed by the uncontroverted evidence of the plaintiffs, are substantially as follows:

E. A. Martin, one of the plaintiffs, and C. F. Dike, one of the defendants, first met in July, 1916, at which time Martin was furnishing machinery for a mine being constructed by a company of which Dike was superintendent. Early in September, 1916, while Dike and Martin were driving from the Montreal mine to Miami, and as they were passing the Blue Bird mine, Dike said there was some good mining property in

that vicinity which he could acquire, provided he could get a company to drill it out. At that time Martin told him that he believed he could interest his brothers in the matter, and Dike replied that if this could be done, and a company formed to develop the property, he (Dike) could acquire the property. In a later conversation Martin informed Dike that he had talked with his brothers and Webster, and that they could finance the proposition. Dike then wanted the plaintiffs to carry him for a one-fifth interest in the venture, and this was agreed upon. The plaintiffs, with the exception of E. A. Martin, went to the mining district to meet Dike and look over the property upon which he claimed leases could be procured. Dike introduced them to Smith, and stated that he was a large leaseholder, and had two or three leases in which he thought they would be interested. The plaintiffs and Smith then drove to the southwest quarter of the northwest quarter of section 31, township 29, range 23 east, referred to as the "south forty." Smith stated that he had a large number of tracts, but to his mind this was the best one to start drilling on, giving as his reason that there were two old holes thereon the cuttings from which showed a favorable formation; he stated that he thought so favorably of it that he would like to carry an interest in the prospecting himself; whereupon it was agreed that Smith should have a one-sixth interest in the venture, and the drilling should start on the above described land, and on September 21, 1916, the following contract was entered into:

"This contract made and entered into this 21st day of September, 1916, Witnesseth:

"Whereas, there was executed and delivered to E. A. Martin, as trustee, one contract for mining lease dated the 18th day of September, 1918, leasing to the said trustee the southwest quarter of the northwest quarter of section thirty-one (31), township twenty-nine (29), range twenty-three (23) east of the Indian Meridian, Ottawa county, Okla. Therefore, it is mutually agreed that the said E. A. Martin is holding this lease in trust for the following parties and interests as herewith set forth: C. F. Dike, of Joplin, Mo., one-sixth, W. M. Smith, Baxter Springs, Kan., one-sixth, W. L. Martin, Webb City, Mo., one-sixth, John F. Martin, Joplin, Mo., one-sixth, Perry Webster, Carthage, Mo., one-sixth, E. A. Martin, of Joplin, Mo., one-sixth.

"It is understood and agreed that C. F. Dike is not to participate in the payment of any drilling on this lease. That all payments for drilling will be taken care of pro rata by W. M. Smith, W. L. Martin, John F. Martin, Perry Webster and E. A. Martin, until all drilling has been done. Then a mutual agreement will be arranged for a continuation of C. F. Dike's interest.

"It is further understood and agreed by the parties to this contract, that, immediately upon the completion of each hole, E. A. Martin will pay drill contractor, each party will be required to immediately deliver to said E. A. Martin, trustee, his one-fifth (1-5) of the said drilling, and, if not paid within five (5) days from that date, he shall forfeit and relinquish all right of benefit in the said lease and the other remaining partners shall have the right to prorate the amount and will be interested as per the said proration.

"In witness whereof, we have hereto set our hands and seals this 21st day of September, 1916, to six (6) copies Nos. 1, 2, 3, 4, 5 and 6; each party to receive a copy of this contract.

"C. F. Dike,
"W. M. Smith,
"W. L. Martin,
"John F. Martin,
"Perry Webster,
"E. A. Martin."

After the execution of this contract, drilling operations were begun, and two holes drilled to a depth of 300 feet, but no ore encountered. Upon the completion of the second hole, the plaintiffs informed Dike, who had supervision of the drilling operations, that they did not think it advisable to spend more money on that lease. Dike then told the plaintiffs that if they would consent to drill another hole near the north line of said tract and a showing of ore or open ground was encountered, he would procure a lease on the northwest quarter of the northwest quarter of said section 31, referred to as the "north forty," and they would continue their drilling operations on that tract. This was agreed to, and the third hole was drilled near the northwest corner of the "south forty." The first three holes were paid for by E. A. Martin, the other parties later contributing their proportionate shares of this expense. Soon after the third hole was completed, Dike informed the plaintiff, E. A. Martin, that he was going to drill the fourth hole on the "north forty." Upon the completion of this hole E. A. Martin asked Dike for the depth of it, so payment could be made, and Dike informed him that Smith had paid for said drilling. Martin insisted upon being advised of the amount due, but Dike replied

that there was no hurry, that he would furnish him the depth of the hole in a few days, and they would settle up.

The fifth and sixth holes were drilled on the "north forty." Prior to the time the sixth hole was drilled, E. A. Martin asked Dike for the depth of the fourth and fifth holes, stating that he wanted to pay for drilling them, but Dike replied that there was no hurry. The sixth hole was subsequently drilled, and was completed on March 17, 1917; on March 19, 1917, Dike told E. A. Martin that they had encountered a good showing of ore in the sixth hole, and he was sorry that the plaintiffs had quit. Martin insisted that they had not quit, and, upon being advised that there had been about 900 feet of drilling done in the last three holes, delivered to Dike his check for $720, being four-fifths of the cost of said drilling. Dike took the check, but said he did not know the exact depth that had been drilled, and did not know that the amount was correct, but that he would measure the last hole and advise the plaintiffs of the correct amount, and they could settle with him. He did not cash the check for $720.

At this conversation Dike asked the plaintiffs if they were willing to furnish as much as $4,000 or $5,000 each to continue prospecting, and they agreed to furnish as much as $20,000, if necessary, to carry out the work and procure the necessary machinery. Dike agreed to return that night and furnish the plaintiffs with the correct number of feet drilled in the last three holes, but he did not do this, and when the plaintiffs called on him at his home, he advised them that he had seen Smith that day, and that it was not agreeable with Smith that the plaintiffs be granted interests in the lease, but sometime later telephoned E. A. Martin, stating that he and Smith would be willing to grant them a one-sixth interest in the property, but not a one-sixth interest each. The contract for lease covering the property in controversy was executed by O. S. Picher to the defendant Dike on December 1, 1916. The defendant O. S. Picher filed no pleading in the trial court, the judgment does not in terms refer to him, and he is not a party here.

The plaintiffs in error insist that the decisive question for determination is whether the evidence establishes an oral general contract and understanding between the parties whereby they were to secure lead and zinc mining leases in the Miami district and prospect and develop thereon, or whether their entire agreement was embodied in the written contract above set out, and contend that the evidence fails to show that there was a general blanket oral contract of joint adventure, but on the contrary the entire agreement between the parties was embodied in said written contract.

In support of this contention they invoke the well-known rule that "where preliminary negotiations are consummated by a written agreement, or an oral contract is evidenced by a subsequent agreed memorandum in writing, the writing supersedes all previous understandings, and the intent of the parties must be ascertained therefrom" (section 942, Rev. Laws 1910; 13 C. J. 544): and, in addition thereto, point to the following question propounded to the defendant E. A. Martin, and his answer thereto:

"Mr. Currey: I ask leave now to ask a question as a basis for an objection. Your conversation that you had with him, whatever it was, finally culminated in the execution of this contract which I read to the court and which has been marked an exhibit there to a deposition? The Witness: Yes, sir."

There appears to be no ambiguity in the contract; neither is any reference made therein to any general oral understanding between the parties; no other land is referred to, and nothing appears therein indicating or suggesting that this contract did not embody the entire agreement of the parties up to the time of its execution. Furthermore, the witness E. A. Martin testified, and evidently understood, that all of their prior negotiations and agreements were merged into the written contract; therefore, any negotiations, conversations, and understandings had prior to the execution of such contract must be disregarded and the contract must be considered as containing the entire agreement between the parties at that time. However, this rule does not apply so as to prohibit the establishment by parol of an agreement between the parties entered into subsequently to the execution of the written contract, notwithstanding such agreement may have the effect of adding to, changing, modifying, or even altogether abrogating the contract of the parties as evidenced by the writing. Section 988, Rev. Laws 1910; 17 Cyc. 734. So, let us consider that which transpired after the execution of the written contract.

It appears that after two holes had been drilled on the land described in the written contract, and no showing of ore or open ground obtained, the plaintiffs informed the

defendants that they did not think favorably of that tract and did not consider it advisable to expend more money in attempting to discover ore thereon, whereupon the defendant Dike stated to the plaintiffs that he and Smith did not like to have them quit; that he believed they might discover open ground to the north, and if the plaintiffs would consent to drill a hole near the north line of said tract and ore or open ground was encountered, he would procure a lease on the "north forty," and they would continue drilling it as they had the other lease. To this the plaintiffs agreed, and the third hole was drilled near the northwest corner of the "south forty." The cost of drilling this hole was paid for by the check of E. A. Martin, dated December 8, 1916. At this time Martin asked Dike if he had procured a lease on the "north forty," and Dike replied that he had. A showing of lead was encountered in the third hole, and Dike agreed with the plaintiffs to locate the fourth hole on the "north forty." There was nothing to indicate the dividing line between these two forty-acre tracts, and, evidently through mistake, the fourth hole was also drilled on the "south forty." Zinc ore and open ground were encountered in this hole, and the indications were so favorable as to justify further drilling. The plaintiffs endeavored to ascertain the amount due for drilling this hole so they might pay therefor, but the defendants failed to furnish them with this information. The fifth and sixth holes were drilled on the "north forty," and valuable ore deposits discovered, and it was after this discovery and without affording them an opportunity to pay their proportionate shares of drilling that the defendants informed the plaintiffs that they (plaintiffs) were no longer interested in the venture.

As we view the evidence, it shows that there was a subsequent parol agreement between the parties to drill the "north forty" on the same terms as they had operated on the "south forty," and as they were joint adventurers in the first instance, they continued as such under the subsequent agreement. This subsequent agreement is founded upon a sufficient consideration, consisting of the mutual promises of the parties. 23 Cyc. 454; King v. Barnes, 109 N. Y. 285, 16 N. E. 332; Botsford v. Van Riper, 33 Nev. 190, 110 Pac. 705; Miller v. Walser (Nev.) 181 Pac. 437.

The relation between joint adventurers is fiduciary in its character, and demands the utmost good faith in all the dealings of the parties with each other. 15 R. C. L. 501; Botsford v. Van Riper, supra.

The evidence of the plaintiffs, which is uncontradicted by either of the defendants, indicates that the defendants have not shown the good faith and fairness toward the plaintiffs which is exacted of coadventurers in the prosecution of a common enterprise. They induced the plaintiffs to contribute their proportionate shares of the expense of drilling the third hole, so located that it would in a measure test the "north forty," under the promise and agreement to procure a lease and continue operations thereon upon the same terms and in the same manner as they were then operating on the "south forty," and, so far as the plaintiffs were informed, the work of the "north forty" was being prosecuted by and for all parties. They were not given an opportunity to pay their shares of the expense, though they sought to ascertain the amount thereof in order that they might contribute. Of course, if the plaintiffs had upon reasonable notice and demand by the defendants refused to contribute their due proportions of the expense of drilling on the "north forty," they could not invoke the aid of a court to secure their interests therein, or a share in the proceeds. Saunders v. McDonough (Ala.) 67 South. 591. But the mere fact that the defendants paid the expenses or furnished all the money used in prospecting the "north forty," does not exclude the plaintiffs from sharing in the proceeds (Botsford v. Van Riper, supra; Lind v. Webber, 36 Nev. 623, 134 Pac. 461); and particularly is this true when the plaintiffs were at all times able, ready, and willing to pay their proportionate shares, and were prevented from so doing by the acts of the defendants.

Under the facts in this case, the money advanced by the defendants and used in drilling and prospecting the "north forty," without giving the plaintiffs an opportunity to participate in the payment therefor, will be considered in the nature of a loan to the joint adventure, and for the benefit of the joint adventurers. Miller v. Walser, supra.

If any party to the joint adventure had refused to substantially perform his obligation, his associates might terminate their relation with him and carry out the enterprise to his exclusion, and if for this or any other valid reason they chose to terminate the relationship, they could do so only by giving notice to him that the relationship was then and there ended. Saunders v. McDonough, supra.

The contention that the statute of frauds prevents a recovery is without merit. As has already been said, the parties occupied a fiduciary relation, and it was through a violation of this relation and of the confidence imposed in them by the plaintiffs that the property involved was obtained by the defendants. In Pomeroy's Equity Jurisprudence, vol. 1, sec. 155, the subject of constructive trusts is treated thus:

"Constructive trusts are raised by equity for the purpose of working out right and justice, where there was no intention of the party to create such a relation, and often directly contrary to the intention of the one holding the legal title. All instances of constructive trust may be referred to what equity denominates fraud, either actual or constructive, including acts or omissions in violation of fiduciary obligations. If one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner. Courts of equity, by thus extending the fundamental principle of trusts—that is, the principle of a division between the legal estate in one and the equitable estate in another—to cases of actual or constructive fraud and breach of good faith, are enabled to wield a remedial power of tremendous efficacy in protecting the rights of property."

Clearly, a constructive trust was imposed upon the property involved in favor of the plaintiffs to the extent of a one-sixth interest each therein, and it is well settled in this jurisdiction that such trusts are not within the statute of frauds. Powell v. Adler, 69 Oklahoma, 172 Pac. 55; Ewing v. Ewing, 33 Okla. 414, 136 Pac. 811; McCoy v. McCoy, 30 Okla. 379, 121 Pac. 176.

In cases of purely equitable cognizance the judgment of the trial court will not be disturbed unless it is clearly against the weight of the evidence. We have examined the record, and find that the judgment is not clearly against the weight of the evidence; therefore, such judgment will not be disturbed.

The judgment of the trial court is affirmed.

HARRISON, C. J., and JOHNSON, McNEILL, and ELTING, JJ., concur.