Dan L. HARDEGREE, Plaintiff in Error,

v.

Townsend M. ZINK and J. C. Bond, Defendants in Error.

Lucille COTTEN, Plaintiff in Error,

v.

Townsend M. ZINK and J. C. Bond, Defendants in Error.

Nos. 39567, 39568.

Supreme Court of Oklahoma.

Feb. 5, 1963.

Rehearing Denied June 4, 1963.

Chamberlin & McBee, Frederick, for plaintiffs in error.

Tolbert & Gillespie, Hobart, A. H. Huggins, Norman, for defendant in error, Townsend M. Zink.

BERRY, Justice.

The above styled and numbered cases were consolidated for trial below and will be treated as consolidated cases here.

We will first consider and dispose of the appeal in No. 39,567. In doing so we will refer to the plaintiff in error, Dan L. Hardegree, as "plaintiff"; to defendant in error, Townsend M. Zink, as "defendant"; and to the remaining defendant in error as "Bond".

On February 21, 1955, J. H. and Emma Poole executed and delivered to plaintiff, for a consideration of $5.00 an acre, an oil and gas lease covering minerals above 1250 feet underlying the NE/4, Sec. 29, T. 7N, R. 6W, Kiowa County, Oklahoma. The primary term of the lease was one year. Production of oil or gas in paying quantities during said year would serve to extend the lease during the period of such production.

While plaintiff assigned interests in the lease to a number of persons, under the issues presented the only assignments which are directly involved are these: Plaintiff's assignment to his mother, Lucille Cotten, of an undivided 29/128ths interest in the lease in so far as it covered the NW/4 of the NE/4; a reassignment by Mrs. Cotten of said interest to defendant, which was given in order to enable defendant to perfect title to the lease; an assignment of the lease by plaintiff to defendant; an assignment to Bond's predecessor in title of a net one-half of the production from the NW/4 of the NE/4.

The only assignment that plaintiff questions is his to defendant. He asserts that the assignment was given while he and defendant were mining partners; that the sole purpose in giving it was to enable defendant to clear title to the lease; that it was understood that he, plaintiff, retained an undivided one-half interest in the lease which is subject to the assignments to Mrs. Cotten and the one under which Bond claims.

In his petition filed below, plaintiff asked that he be adjudged to own an undivided one-half interest in the lease subject only to the interest assigned Mrs. Cotten. He also sought an accounting as to defendant, the appointment of a receiver and for injunctive relief. While a receiver was subse-

quently appointed, he did not cause the lease to be developed.

Following trial of case to the court, the court found and held that on July 8, 1957, plaintiff abandoned and forfeited his interest in the lease and that he thereafter had no interest in the lease; that defendant owned the lease subject to the assignments made to Mrs. Cotten and to Bond's predecessors in title. Judgment was accordingly entered.

From order of the trial court denying plaintiff's motion for new trial which was directed to the mentioned judgment, plaintiff perfected this appeal.

In support of his petition in error, plaintiff contends that the finding of the trial court that plaintiff abandoned and forfeited his interest in the lease is contrary to the evidence; that "the evidence was wholly insufficient for the court to find that (defendant) was entitled to terminate the partnership contract by virtue of the abandonment."

The pertinent evidence bearing upon the mentioned contentions can be summarized thusly:

Plaintiff testified that within one year from date of execution of the lease, he caused 5 or 6 test wells for oil and gas to be drilled on the leased premises; that two of the wells were drilled on the NW/4 of the NE/4; that some of the wells were completed as oil wells and produced oil in paying quantities; that a portion thereof was delivered to a trucking concern and the remainder was placed in storage. There is competent evidence that none of the wells so drilled would produce either oil or gas in paying quantities.

As a result of the drilling operations numerous lien claims were asserted against the lease, and a mortgage given by a drilling contractor on personal property used in drilling and producing the lease was in default. It appears that an action was instituted to foreclose the mortgage in connection with which a receiver was appointed to take charge of the property subject to the mortgage. It further appears that in this action

numerous lien holders sought to foreclose their liens on the leasehold. As a result of said action or actions all personal property on the lease was removed except casing cemented in the holes and a small amount of rods and tubing. Moreover, the action served to establish money judgments against plaintiff and liens against the leasehold which aggregated several thousands of dollars. The record tends to show that plaintiff was not then in a financial position to discharge the liens, equip the wells for production or drill further test wells for oil or gas. For said reason the trustee for the lessors was in a position to assert that the lease had been abandoned and that for said reason the lease should be cancelled. It appears that such was the position of the trustee and that an attorney had been consulted relative to instituting an action to cancel the lease.

Shortly prior to March 11, 1957, plaintiff became acquainted with defendant. Plaintiff represented that commercial wells had been drilled on the east half (80 acres) of the lease; that he could furnish a commercial title to the lease as to said 80 acres; that he would sell an undivided one-half interest in the east portion of the lease for $8,215.70, $800.00 of which was to be paid in cash upon a contract of sale being agreed upon. It appears that plaintiff agreed that all of the consideration would be expended in equipping and placing wells drilled on the east one-half on production and in further developing said portion of the lease. Defendant accepted plaintiff's offer and a letter was drafted which evidenced in part the terms of the sale. Defendant paid plaintiff the agreed sum of $800.00. Plaintiff used but a small portion of this down payment in equipping or developing the lease. Shortly thereafter, defendant visited the lease and investigated those things bearing upon the value of the lease and plaintiff's interest therein. In connection with the conditions that defendant found to exist, the court made this finding:

"* * * On April 1, 1957, the defendant, * * * upon coming to Hobart found that the lease was subject to cancellation by reason of nondevelopment and non-production, that there were steps being taken to institute suit to cancel the lease by the landowners, that all of the equipment on the lease had been removed, except pipe in the holes, most of which was cemented in and without value, that there were numerous unpaid mechanics' and materialmen's liens which were in the process of being foreclosed, that a receiver had been appointed over the lease, that a decree of foreclosure in the District Court of Kiowa County, Oklahoma, was then pending, that there were unpaid mortgages, outstanding interests in the leasehold estate, and that due to the condition of the title, the liens, mortgages, and position of the landowners, that there was no value to the lease, * *."

The Court further found that subsequently:

"* * * a new oral agreement was entered into by and between the plaintiff and defendant on or about April 1, 1957, when the entire leasehold estate as to all of the interest of the plaintiff was assigned to the defendant, with the understanding that both would contribute time and effort towards developing and saving the lease. That thereafter, it was found that there were more liens than anticipated, and numerous items to be paid, and that the relations of the parties was not satisfactory, and that finally on July 8, 1957, all arrangements between the parties were cancelled, and from that date to the filing of this action the lease was entirely developed and operated by the defendant, * * *, individually, to which he devoted his capital and his time and efforts. That as a result of such time and efforts, he was able to clear the title, and was able to secure a ratification of the old oil and gas lease from the landowners, which ratification was to him individually, the landowners ratifying the same upon his showing

that he was the sole owner of the lease and had developed the same and had the same in production. That had the lease not been cleared through his efforts, and the ratification secured, the leasehold estate would have been entirely lost. That due to the complete abandonment of the lease and enterprise by the plaintiff on July 8, 1957, and due to the individual development and perfecting of the lease by the defendant, * * *, that judgment should be entered for the defendant, * * *, and against the plaintiff, * * *, and that the cost of this action should be assessed against the plaintiff, * * *."

The findings so made are supported by competent evidence.

■ On the issue of whether plaintiff terminated or defendant terminated the mining partnership and whether plaintiff in fact abandoned the lease, there is competent evidence that on or about June 9, 1957, plaintiff, while upon the lease, advised defendant that he, plaintiff, "was through with the lease, wasn't going to do any more with it"; that plaintiff subsequently removed his tools from the lease; that shortly after June 9, 1957, defendant advised plaintiff that the agreements between them were terminated; that plaintiff did not thereafter perform any labor nor furnish any money in developing the lease. We add, that there is also competent evidence tending to show that plaintiff's services and work were entirely unsatisfactory and that plaintiff failed to satisfactorily comply with any agreement that he made with defendant concerning the lease; that following plaintiff's abandonment of the lease defendant caused the lease to be developed; that as of date of trial, several wells had been drilled on the lease which were producing oil in paying quantities; that no wells drilled prior to July, 1957, in fact produced oil or gas in paying quantities; that defendant entered into a contract with Bond's predecessor in title (hereafter referred to as "contractors") under which it was agreed that test wells would be drilled on the NW/4 of the NE/4; that three such wells were drilled which produced oil in paying quantities; that in consideration of defraying the cost of drilling and equipping the wells, the contractors should be entitled to a net one-half of oil or gas produced.

It is not disputed but that plaintiff's purpose in assigning the lease to defendant was to enable defendant to obtain a ratification thereof, clear title thereto and develop it.

The record shows that as of date of the assignment the lease had but a highly speculative and nominal value; that the value of the lease was far less than the aggregate amount of the liens that had been impressed thereon; that the judgments against plaintiff which defendant caused to be satisfied in clearing the title and in obtaining ratification of the lease, and that portion of the $800.00 which plaintiff did not expend upon the lease, together with the value of the spudder which plaintiff delivered to defendant, exceeded the then-value of the lease and oil delivered to a truck and that in storage; that as aforesaid, plaintiff expended no labor upon and advanced no funds for developing the lease after July, 1957, and in fact instituted the instant action on November 19, 1960 only after defendant's efforts had served in saving the lease and developing same; that defendant, under competent evidence, had just cause for terminating the mining partnership. Plaintiff, nevertheless, contends defendant could not properly terminate the mining partnership and that if he (plaintiff) in fact abandoned the lease, he did not thereby forfeit his interest in the partnership nor his right to an accounting.

■ On the issue of whether defendant could, for cause, terminate the partnership, defendant points out that in the sixth paragraph of the syllabus to Dike et al. v. Martin et al., 85 Okl. 103, 204 P. 1106, it was said that "If either party to a joint adventure has refused to substantially perform his obligations, his associates may terminate their relations with him, and carry out the enterprise to his exclusion, and if for this, or any other valid reason, they choose to terminate the relationship, they could do so only by

giving notice to him that the relationship was then and there ended." In view of this rule, we are of the opinion that under the evidence the trial court did not err in finding that defendant was justified in terminating the partnership.

In support of plaintiff's contention that he did not forfeit his interest in the lease or a right to an accounting by abandoning the lease, plaintiff cites 40 Am.Jur. "Partnership", Sec. 119, p. 212; 30 Am. Jur. "Joint Adventure", Sec. 42 at p. 969, and Sec. 47 at p. 974 and other authority.

To our way of thinking, Forbes v. Becker, 150 Okl. 281, 1 P.2d 721, 80 A.L.R. 1, is dispositive of this issue and that in reaching a conclusion it is unnecessary to turn to the decisions of other courts.

In the cited case, as here, a mining partnership existed that had for its purpose exploring for oil and gas. At a time when the partnership was engaged in such work, one of the partners (Forbes) made known to the other that he was abandoning the partnership, and consistent with said declaration thereafter did nothing to further the business of the partnership. At the time of the abandonment the likelihood of the partnership venture proving successful was extremely doubtful. It was only after the efforts of the other partner (Becker) had resulted in the venture being successful, that Forbes sought an interest in the fruits of the venture.

The trial court found and held for Becker and upon appeal the judgment was affirmed. In affirming, we pointed out that a mining partner may dissolve a mining partnership; that a mining partner who abandons the partnership is not in all instances entitled to a share of the property of the partnership or the fruits of a venture that are attributable to the efforts of the partner who carries on following the abandonment.

After pointing out that Forbes contended that there was a general or universal rule that a partner who abandons a partnership, is entitled to a share of the partnership property and profits accruing from the use of such property, this is said at p. 726 of 1 P.2d:

"* * * As a matter of fact, there is no universal rule, and it has been held by the highest authorities that there is not even a general rule that entitles a retiring partner to an interest in firm assets, or requires a partner using firm property or firm funds in his business, after the termination of the partnership status, to account for or divide profits so made with a former partner.

"In a case where parties, who had agreed to finance the performance of a contract made with the state, violated their agreement after having furnished part of the necessary funds, and yet sued for an agreed one-half of the profits, the Ohio court said: 'There is, perhaps, no general rule without exceptions, certainly none that will do exact justice in every case, or that may not do injustice in particular cases. There is one general maxim, however, that is seldom found to fail, to wit, that when a supposed rule is so applied as to work manifest injustice, it is most likely that it is either misunderstood or misapplied.' Durbin v. Barber and Barney, 14 Ohio, 311."

Following the quoted matter will be found citations to cases which tend to sustain the general proposition that the matter of whether a partner who abandons a partnership forfeits his interest in the partnership depends upon the facts; that if under all of the facts it would be unjust to permit him to share in property or gains of the partnership, he will not be permitted to do so.

For a recent opinion to the general effect that abandonment of a joint adventure by a co-adventurer may serve to deprive him of the right to an accounting, see Burkett v. Snakard et al., Okl., 365 P.2d 1006.

We are of the opinion that there is competent evidence which serves to bring this case within the purview of the law as an-

nounced in the cited cases, and for said reason the judgment in No. 39,567 is affirmed.

We next consider the appeal in No. 39,-568.

Defendant does not dispute the validity of plaintiff's assignment to Mrs. Cotten of a $^{20}/_{128}$ths interest in the lease in so far as it covered the NW/4 of the leased premises. He contends, however, that this assignment was subject to the contract entered into between defendant and Bond's predecessors in title under which a net one-half of the production from said 40 becomes payable to the contractors (Bond), therefore, that Mrs. Cotten's interest was in fact a net $^{10}/_{128}$ths of oil or gas produced, saved and sold from the NW/4; that Mrs. Cotten's interest should bear $^{20}/_{128}$ths of the cost of clearing the title, obtaining ratification of the lease and of all expenses incurred by defendant in developing and producing the lease. The trial court found in accordance with defendant's contention, save Mrs. Cotten's interest was not charged with the value of defendant's personal services and his travel expenses incurred in clearing the title and developing the lease.

It stands admitted that defendant's purpose in obtaining the assignment from Mrs. Cotten was to facilitate the matter of clearing title to the lease, obtaining ratification of the lease and developing same and that Mrs. Cotten was not a party to the contract under which Bond claims. There is no evidence showing that she had knowledge of the contract or that she ratified it. The trial court nevertheless found that since defendant had reached the point in attempting to develop the lease where he was no longer in a financial position to do so without entering into a contract such as the one under consideration, Mrs. Cotten's interest should be made subject to the contract. Defendant has not cited authority tending to sustain this finding and conclusion.

■ In our opinion defendant had neither express nor implied authority to in effect reduce Mrs. Cotten's interest in production from the NW/4 by entering into a contract with a third person to develop the lease in consideration of a share in the net production therefrom.

As to cost and expenses chargeable to Mrs. Cotten's interest in the NW/4, she admits that her interest should bear its pro rata part of the actual cost of developing said forty but asserts that her interest "cannot be charged with development expenses of acreage (remainder of the lease) in which she claimed no interest"; that her interest should not bear any part of defendant's cost in acquiring the lease.

■ It appears that the liens which defendant caused to be discharged covered the entire lease. Therefore, under the facts, Mrs. Cotten's interest is therefore chargeable with $^{5}/_{128}$ths part of the aggregate cost of discharging such liens together with reasonable expenses incurred by defendant in discharging the liens. As to cost of development of the lease where no lien resulted, Mrs. Cotten's interest should bear $^{20}/_{128}$ths of said cost in so far as incurred on the NW/4 but no portion of such expense where incurred on remainder of lease. Her interest should therefore be charged only with $^{20}/_{128}$ths of the reasonable value of work and services performed by the contractor on the NW/4 and of like but actual cost and expenses incurred by others on the forty. As to overhead, such as bookkeeping, same should in so far as possible be prorated and charged to Mrs. Cotten's interest in the ratio that cost of drilling operations and development on the NW/4 bore to cost of drilling operations and development of the entire lease. The cash consideration paid by defendant to plaintiff for an interest in the lease and any amount paid to and used by plaintiff in discharging liens thereon or in developing the lease should not as indicated be charged to Mrs. Cotten's interest. Under the record, Mrs. Cotten's interest in production from the NW/4 is a $^{20}/_{128}$ths of the net production accruing to the $^{7}/_{8}$ths working interest. Her interest is subject to and shall be impressed with a lien in defendant's favor until such time as production

accruing from her interest equals and serves to discharge the aggregate amount of cost and expenses chargeable thereto.

For reasons stated, the judgment in No. 39,568 is reversed and the trial court is directed to grant Mrs. Cotten a new trial and to otherwise proceed in accordance with the views herein expressed.

BLACKBIRD, C. J., HALLEY, V. C. J., and DAVISON, JOHNSON and WILLIAMS, JJ., concur.

WELCH, JACKSON and IRWIN, JJ., concur as to Mrs. Cotten and dissent as to Hardegree.

JACKSON, Justice (dissenting in the Hardegree case).

The legal question for our consideration in this case is what rights, if any, does a partner or joint adventurer have when he retires, or is retired, from an active partnership or joint adventure arrangement. Also for our consideration is the factual question of whether Mr. Hardegree abandoned the joint adventure or whether he was expelled by Mr. Zink and then to discover and apply the applicable law to the facts as we find them. Additionally and finally we must determine whether Mr. Hardegree has forfeited his investment in the venture, and if not, then determine under the facts and law whether he may recover a share of the profits subsequent to his retirement or be relegated to the recovery of the value of his investment at the time of dissolution plus interest.

The facts in this case and the contentions of the parties will have greater significance if we first give attention to the law. But at the outset we must notice that there is a lack of complete harmony in some of our former expressions and we must ultimately give some consideration to the Uniform Partnership Act which was enacted by our Legislature in 1955. 54 O.S.1961 § 201 et seq.

In Curtin v. Moroney et al. (1926), 117 Okl. 276, 246 P. 232, the plaintiff, Curtin, owned an undivided one-fourth interest in the partnership estate and voluntarily withdrew from the partnership which was engaged in the drilling of oil wells. The trial court found that plaintiff's partners were without fault and denied plaintiff any right to participate in profits earned subsequent to his withdrawal. In the body of the opinion we said:

"* * * Plaintiff contends that this was error, and calls our attention to the rule stated in Durbin v. Barber, 14 Ohio, 311, Bates on Partnership, vol. II, § 794, p. 842, and 30 Cyc. p. 688, to the effect that, if a court of equity fix upon the time at which a partnership shall be considered as having determined, and it appear that the capital of one partner was subsequently employed by another, who continued to carry on the business, the former is entitled to such proportion of the profits as his capital thus retained bears to the whole capital. *We think this is the general rule, and, in the absence of any statutory provisions to the contrary, is supported by the great weight of authority,* but the rule is not applicable to the facts of the case at bar in this state because we have a statute to the contrary. Section 8116, Compiled Statutes 1921, provides (emphasis supplied):

"'After a partner has given notice of his renunciation of the partnership, he cannot claim any of its subsequent profits, and his copartners may proceed to dissolve the partnership.'" (Notice that Section 8116 C.O.S.—54 O.S.1951 § 14—was repealed in 1955, at the time of the adoption of the Uniform Partnership Act.)

In Forbes v. Becker (1931) 150 Okl. 281, 1 P.2d 721, 80 A.L.R. 1, the plaintiff, Forbes, had invested $650.00 in oil well drilling equipment and obligated himself to pay his partner, Becker, $4,000.00 more for such equipment. He abandoned this partnership in August, 1926, at which time the partnership owed him $850.00 in wages

as a "rough neck." His investment in the property remained at $650.00. On December 24, 1926, Becker gave the plaintiff, Forbes, $1500.00. Whether this was a complete partnership settlement for $1500.00 or whether Becker was paying Forbes $850.00 for his labor and $650.00 for Forbes investment in the drilling equipment was disputed by the parties. But whatever it was, we observed that if the partnership properties and equipment had been liquidated on that date Becker would have owed Forbes an additional sum of $97.51, if nothing be charged Forbes for wear and tear on the equipment during the time Forbes earned wages by using the partnership equipment. For the above equitable reasons, and other reasons set forth in the opinion, we affirmed the judgment of the trial court and held that the partnership settlement should not be set aside upon the ground of fraud. In the third paragraph of our syllabus, and without noticing Curtin v. Moroney, supra, and Sec. 8116, C.O.S. supra, we held:

"It is not a uniform rule that when, upon the dissolution of a firm by the withdrawal of a partner, or by an agreement for termination, property of the firm, for instance an interest in an oil and gas lease, and a contract to drill thereon, is taken over by one partner, and in such drilling a portion of partnership funds are used and some partnership tools are used, and the drilling results in discovery of gas in paying quantities, that the other partner is entitled to an interest in the lease or in the profits derived therefrom, but on the contrary the matter of a partnership settlement depends upon the nature of the trade, the mode of carrying it on, the capital employed, the state of account between the parties, the element of the bearing of the risk, and the conduct of the parties after the termination of the partnership."

There is case law, as hereinafter noted in support of our syllabus No. 3 in the Forbes case, but such a rule, without more,

authorizes complete "free wheeling" in the settlement of partnership estates without any guide lines whatever except the individual judge's conception of equity in any given case. In addition thereto it encourages an appeal in all such litigation in order to get the equity view of the court of last resort.

Our syllabus No. 3 in the Forbes case provoked a very thorough and exhaustive study on the question of "Accountability of Partner or Joint Adventurer for Profits Earned Subsequently to Death or Dissolution", and is annotated in 80 A.L.R. pages 12 to 98, inclusive.

At page 15 of the annotation the author states:

"It may be laid down as a general rule that, in the absence of special circumstances and subject to just allowance and deductions, where profits are made by a partner or joint adventurer subsequently to death or dissolution, through employment of the firm assets or in continuation of the business of the firm, he is accountable therefor to his copartner or co-adventurer or to the latter's legal representative."

In support of the foregoing rule cases are cited from thirty-one states, the Supreme Court of the United States, and England, Canada and Ireland. Our decision in Curtin v. Moroney, supra, is cited in support of the rule.

At page 30 of the annotation, it is said:

"In a *few* cases, probably as a development of statements contained in the early English cases, the view has been taken, contrary to the general rule laid down in II.a, supra (80 ALR page 15, supra), that there is no universal rule applicable to all cases, but that the accountability of a partner for profits earned after dissolution must depend upon the circumstances of the individual case. Or, as stated in the reported case (Forbes v. Becker, Ante, 1) 'there is no universal rule; and it has been held by the highest authorities that there is not even a general rule that

entitles a retiring partner to an interest in firm assets, or requires a partner using firm property or firm funds in his business, after the termination of the partnership status, to account or divide profits so made with a former partner." (Emphasis supplied.)

Decisions from England and seven states in our union, including Oklahoma, are listed as following that rule. All seven states so listed, except Virginia, are also shown at pages 16 through 19 as supporting the rule above-quoted from the Curtin case.

In the case now before us, Hardegree v. Zink, Mr. Hardegree contends that Mr. Zink entirely repudiated the partnership or joint venture and claimed the entire property as his own. At page 41 of the annotation the author states:

"Where a partner, in continuing the business of the partnership after dissolution, entirely repudiates the partnership and claims the assets as his own property in plain violation of the rights of his former partner, he will ordinarily be held accountable for subsequently earned profits."

In the instant case Mr. Hardegree also contends in effect that he, Hardegree, was expelled from the firm or joint venture arrangement. At page 43 of the annotation the author states:

"Where dissolution is affected through the expulsion or exclusion of a partner from the firm, it is universally held that such partner is entitled to an accounting of the subsequently earned profits. * * * This rule is supported by practically all of the cases cited in the present division of the annotation."

At page 48 of the annotation it is said:

"A partner cannot be denied the right to participate in the profits of the firm or venture upon the ground that he has failed to apply his share of the capital, where such failure is due to the fault or defeasance of the other partner."

The pertinency of this quotation will become obvious in our discussion of the evidence, as will also the following quotation from page 75:

"It is generally held, where the assets of a firm have been used by one partner in continuing the business after dissolution, that the other partner or his legal representatives may take either the profits attributable to the use of his interest in the assets or interest on his share of the capital." (citing cases from 18 states)

While the last quoted rule is a common law rule it also appears to be the rule established in the Uniform Partnership Act. See 54 O.S.1961 § 201 et seq.; Anno. 2 A.L.R.2d at page 1095, under annotation entitled "construction and application of § 42 of Uniform Partnership Act as to rights of parties where business is continued after a partner retires or dies" and beginning at page 1084; and see also notes on The Uniform Partnership Act by Bandy and Elkouri in 1956 reported in 9 Oklahoma Law Review at page 387. In citing the statute and these commentaries I am not unmindful of the fact that the Uniform Partnership Act is not specifically made applicable to joint adventures. However, I am convinced that in the area now under discussion there is no substantial difference between common law and the provisions of the Uniform Partnership Act. I am also of the opinion that the common law as applied to the rights of joint adventurers after dissolution is no different, and should not be different, than the rule expressed in the Uniform Partnership Act in reference to partners. Anno. 55 A.L.R. 2d at page 1396.

In the instant case Mr. Zink contends that Hardegree completely and wholly abandoned the venture on or about July 8, 1957. The significance of "abandonment" is discussed in Anno. 55 A.L.R.2d 1391, under the subject "Rights in Profits Earned by Partnership or Joint Adventure

after death or Dissolution", at page 1396. Therein it is said:

"While there is a possibility of different results being reached in the case of dissolution by abandonment and dissolution by expulsion, in which latter case the dissolution may be said to be due to fault or fraud of one of the parties, the cases as a general rule make no distinction between the various forms of dissolution with respect to the accountability for subsequently earned profits. If the partner, instead of winding up the affairs of the firm and effecting a settlement with his copartner or the latter's representative, continues the business and uses the firm assets in earning profits, it is immaterial (except as the question may be affected by express contract or by the fault or wrong of either party) in what manner the dissolution was affected." (See 5(a), infra, page 1402.)

In 55 A.L.R.2d page 1412, it is said:

"The later cases are not in accord on the question whether abandonment of a joint adventure constitutes a reason for denial of a share in the profits thereafter earned."

From my examination of the record in this case it appears that on March 11, 1957, Hardegree owned the lease in question, subject to the Cotten interest in the northwest 40 acres. Hardegree had drilled five wells on the lease, four of which had been cased. He had some rods, tubing and check valves on the lease of his estimated salvage value of $2200. He owned $450.00 worth of oil in storage tanks as well as a Fort Worth spudder, free of liens, which he valued at $3,000.00.

On March 11, 1957, Hardegree was in financial difficulties and approached Mr. Zink. On this date Hardegree and Zink entered into a contract wherein it was agreed that Zink would spend $8,215.70 in the development of the east 80 acres for an undivided one-half interest therein and in the equipment, less the spudder. $800.00 was paid to Hardegree in cash, Hardegree having represented that his title to the lease was good and that he would be able to remove and discharge the liens and other obligations, some of which were in the form of payments to be made out of production. Zink was not made fully aware of the amount and status of the liens and claims pending, and it seems doubtful if Hardegree fully appreciated their seriousness.

However, by April 1, 1957, Zink had investigated the lien and judgment records in Kiowa county and had also learned that the lessor had employed counsel to forfeit the entire lease for non-production. At that time Zink's investment in the lease was less than $1,000. He did not rescind for fraud but brought these matters to Hardegree's attention and a supplemental agreement was entered into on or about that date. The original contract was unchanged except that since it would be necessary for Zink to advance money to pay off the liens and judgments, and oil payments, and make an effort to save the lease as against the threatened cancellation suit by the lessors, he demanded and received an undivided one-half interest in the west 80 acres subject to the Cotten interest. He was also to advance to Hardegree $250.00 per month for living expenses until these expenses could be taken from Hardegree's share of the production. Money advanced by Zink to pay off liens and judgments was a loan of money to Hardegree, if I correctly understand the agreement. In a recorded telephone conversation with Hardegree's attorney on April 4, 1957, Mr. Zink made the following statement:

"I was to advance the ready cash to pay off his indebtedness and clean up the liens against the Poole lease, furthermore I intended to advance Mr. Hardegree $250.00 a month, thereby enabling him to live until such time as the oil runs were enough to enable this money to be taken from income. In turn, Mr. Hardegree was to give me an assignment of the entire Poole Lease or a total of 160 acres less a 20/128ths

interest to Mrs. Lucille Cotten, his mother, this interest to be in the northwest forty acres only."

On or about April 5, 1957, the entire working interest in the quarter section, including the Cotten interest, was assigned to Zink in order to facilitate the clearing of liens and to discourage the filing of others. It was also believed that this action would discourage the filing of forfeiture proceedings by the lessor. At or about the same time Hardegree executed a bill of sale to Zink conveying title to the Fort Worth spudder. However, if I correctly understand the facts this was intended as a mere naked legal title and conveyed no equitable interest. From the record Zink is claiming the spudder but in Hardegree's brief it appears that he recovered it in 1959.

It is contended by Zink, and the trial court found, that subsequent to April 1, 1957, substantial additional indebtedness and liens were found which had not come to Zink's attention prior to April 1, 1957. I have been unable to determine that this is a correct conclusion. At pages 370 and 373 of the record I find Mr. Zink testifying on cross examination as follows:

"Q. What really bothered you that showed up about the last of March (1957) besides the two thousand dollars to Frierson; what one thing really bothered you.

"A. $144.00 to Mr. Ratliff, four hundred some odd dollars to Mr. McGlassen; an additional four hundred some odd dollars to Tri County, and various others.

\* \* \* \* \* \*

"Q. Tell we what else there was?

"A. He was hard up for living expenses"

Page 373:

"Q. This $3800.00 includes the two thousand dollar payment to Mr. Gillespie for claims; two or three items where you paid him a small fee; $100.00 to Ralph Greb; $1000.00 to Frierson; all of those were within the $3800.00?

"A. Yes sir."

All claims were ultimately settled for $3,847.71 and, I believe, in the exact amounts which Hardegree had said prior to April 1, 1957, were the correct amounts. I believe Mrs. Zink's records and Mr. Zink's testimony support this conclusion.

Between April 1, and June 9, 1957, the parties were having their difficulties. Under their agreement Hardegree was to perform labor, to drill additional wells, and put them into production. Zink testified that Hardegree would not stay on the job and work. Hardegree testified that his absence from the lease was largely because of heavy and continuous rains. He also testified that Zink was refusing to provide the working capital and was not advancing his living expenses of $250.00 per month. Tools were lost in the wells on at least two occasions thus delaying the advent of production.

Hardegree testified that prior to July 8, 1957, he told Mr. Zink that Zink was going to start putting up money or that he (Hardegree) "wasn't going to drill any more until he made other arrangements." The whole trouble, according to Hardegree, was that Mr. Zink was not providing living expenses and money to operate.

Zink testified that on "June 9th (1957) Mr. Hardegree told me that he was through with the lease, wasn't going to do any more with it." However, his further testimony shows that Hardegree was working the next morning on the lease and that Zink rough necked for Hardegree practically all through the month of June and the first two days in July. He further testified from his notes as follows:

"Q. What happened the 3rd day of July?

"A. A well that Mr. Hardegree was drilling—I was his rough neck, which was practically all of the month of June and the first two days in July, I rough necked for

Mr. Hardegree which I never agreed to do; I never agreed to furnish him any help, thinking I might help him produce the lease. I took over the job of roughneck, saving about $10.00 a day. The records will show the money I saved by rough necking for Mr. Hardegree; it was turned over to him all during the month of June. On the 3rd day of July, I marked on the calendor that Mr. Hardegree lost the tools in the hole, jars broke 494 feet, I believe. Then on the 8th of July (1957), in the morning of July 8th, Mr. Hardegree came to my little cabin in Gotebo and I told him— That was Monday after he lost the tools—we also on July 3rd, 4th and 5th were running all over Kiowa county trying to find or borrow some tools to get his tools—and we were trying to fish the tools out. On Monday morning Dan (Hardegree) came to my shack and I told him that I was through with him, that I wasn't going to have any more to do with him; I didn't think he knew how to drill or how to operate an oil well, that I was completely through, that whatever he did was his own business; he had convinced me that that was true. * * * by July 8th I was fully convinced that he didn't know."

Hardegree testified that subsequent to Jul, 8, 1957, he borrowed some tools from a Mr. Fitzgerald, employed a Mr. Ralph Greb to help him, and tried to fish the tools out of the well. He further testified that when he was about down on top of the tools the gas blew out and caught on fire. He saved the rig but his arm was burned in the process. This, he says, occurred on or about July 10, 1957. He did no further drilling that morning and states that he made up his mind that he was not going to work without help. According to

his testimony he stayed around until about September, 1957, and claims that he demanded a settlement of Mr. Zink every "30 or 45" days after July, 1957. He did no further work on the lease but testified that he was on the lease 50 to 75 times after July, 1957, and saw Mr. Zink thereafter approximately 25 times. Zink testified that he saw Hardegree only two or three times after July 8, 1957, and on each occasion got into an argument.

As bearing directly upon the question of whether Hardegree abandoned the venture or whether it was terminated by Zink, Mr. Zink testified on cross examination as follows:

"Q. You are the one that terminated the contract, aren't you.

"A. I told him I was through, I wasn't going to pay him any more money.

"Q. You terminated the contract as far as that is concerned.

"A. Yes.

"Q. Thereafter, Mr. Zink, did Dan ever come in and try to pay you and say 'Let's do something?

"A. Not with any money to help.

* * * * * *

"Q. Did he come down several times?

"A. He was in and out of the lease.

"Q. Quite a lot?

"A. I talked to him two or three times.

"Q. Lots of times he was there and you didn't see him?

"A. I expect so."

As bearing upon the question of whether Mr. Zink repudiated the joint venture and claimed the assets as his own property in violation of the rights of his coadventurer he *alleged in his answer* that he was the sole owner of the lease (subject to the Cotten interest); that he had been the sole operator of the lease since April of 1957, when Hardegree assigned all of his right and interest in the lease for a good and sufficient consideration, which was fully paid; that the oral agreements between the parties were superseded by an oral agree-

ment whereby Hardegree agreed to vest full and complete title in Zink for a consideration which was fully paid and performed, and that this last agreement was made and completed on or about July 8, 1957. He *testified* that no agreement was reached on or about July 8, 1957, although he did testify that he had been claiming the legal and equitable title to the lease, subject to the Cotten interest since receipt of the assignment in April, 1957, and more especially since July 8, 1957. His testimony is reported as follows:

"Q. Mr. Zink, as I understand it, at all times since you acquired title to this, and particularly since July 8, 1957, you have contended you were the sole owner of this lease?

"A. Yes, sir.

"Q. With the exception of the contract with Spurgeon?

"A. Yes, sir."

I am unable to agree that Mr. Hardegree deliberately abandoned the oil and gas leasehold estate. I am inclined to the view that Hardegree was forced from the venture because, as Mr. Zink testified he (Mr. Zink) refused to advance Hardegree any more money (as provided in their agreement) and he (Zink) agrees that he terminated the contract. If I am correct in these conclusions then under the law as heretofore quoted from 82 A.L.R. at page 75, Hardegree is entitled to elect whether he will participate in the profits from the continued operation of the venture or whether he will recover the value of his investment in the venture as of July 8, 1957, with interest, assuming of course that he is not estopped by laches from participating in the profits. See 80 A.L.R. page 96, et seq. for cases dealing with laches and estoppel.

The trial court found that Hardegree had been paid for his services between April 1, and July 8, 1957. The money advanced by Zink to Hardegree during that period was not advanced as pay for services, but under the agreement was a loan or advancement of money for Hardegree's living expenses until such time as his living expenses could be taken from Hardegree's share of production.

The trial court further found that Zink developed the lease, placed it in production, and saved the lease by his own efforts. This is a correct conclusion. Overlooked, however, is the fact that Zink was brought into the venture to assist in these accomplishments, and that it was Zink who terminated the venture.

The trial court found that there was no value in the oil and gas lease as of April 1, 1957. In this connection, however, it should not be overlooked that on March 11, 1957, Zink agreed to pay $8,215.70 for an undivided one-half interest in the east 80 acres, and on April 1, 1957, agreed to loan an additional sum to Hardegree sufficient to pay off the disclosed indebtedness plus living expenses for a one-half interest in the west 80, less the Cotten interest. Additionally Hardegree introduced analysis of cores which had been taken from the wells prior to March 11, 1957. He testified that he and Zink in reading these reports prior to March 11, 1957, concluded that the east 80 acres would produce a minimum of 40,000 barrels of oil and a maximum of 100,000 barrels, and that at that time oil was selling at $2.82 per barrel. No expert witnesses were called by either party to determine the productive capacity of the sand or whether the oil would be recoverable from the sand. It is asserted that:

"There is competent evidence that none of the wells so drilled (by Hardegree prior to March 11, 1957) would produce either oil or gas in paying quantities."

This asserted fact was not known on April 1, 1957, and it had not been discovered by the parties as of July 8, 1957. It is significant that while Zink had only invested $7,993.30 in the venture on July 8, 1957, (a sum less than he agreed to pay for one-half interest in the east 80) he had sufficient confidence in the venture so that the trial court was able to determine at the

trial that Zink had invested the total sum of $22,161.86 in the venture; authorized $1,000. for Mrs. Zink's services as book-keeper; denied Zink's mileage claim of $7,700, denied his claim for other traveling expenses in the sum of $1500, and his claim for personal services upon the lease of $30,000. The court made no finding as to the value of Zink's claims as aforesaid for the reason that judgment was being rendered for Mr. Zink. Mr. Zink says that he "virtually bankrupted himself, even mortgaged his home". These facts tend to show that Mr. Zink had confidence in this lease continuously from and after March 11, 1957. I am unable to agree that there was no substantial speculative value in the lease as of April 1, 1957, and on July 8, 1957. Hardegree's equipment and oil in storage tanks, according to his testimony, had a value of $6,117.

The trial court found that Hardegree "has no right, title, claim, or interest in and to the oil and gas leasehold estate * * * for the reason that he has forfeited any that he did have in the said oil and gas leasehold estate by failure to contribute either time and effort, or capital, towards the develop-ment of the oil and gas leasehold estate, or to perpetuate the same." No authorities are cited by counsel supporting this finding of forfeiture.

The court supported its finding of "for-feiture" upon the ground that Hardegree failed to contribute time, effort and capital, and failed to perpetuate the lease.

On the question of whether Hardegree had contributed time, effort and capital, it must be remembered that as of March 11, 1957, Hardegree had acquired the lease, had drilled five wells and cased four; had ac-cumulated oil in storage tanks, and after July 8, 1957, Mr. Zink retained the casing, rods, tubing and check valves, and had the use of the spudder at least until after the Polk contract in 1959.

It must also be remembered that Harde-gree has contributed an undivided one-half interest in the oil and gas lease, subject to the Cotten interest. We do not know the value of that one-half interest. It is true that as of March 11, 1959, Zink agreed to pay $8,215.70 for an undivided one-half in-terest in a clear title to the east 80 acres. However, this does not necessarily reflect its true value for the reason that Zink did not buy his one-half interest in the east 80 from a seller willing but not forced to sell, but from a seller forced to sell. This is especially true in regard to the supplemental agreement of April 1, 1957, involving the west 80. In any event, however, it is clear that as of July 8, 1957, Hardegree had a greater investment of time, effort and capi-tal in the venture than did Mr. Zink.

I have found no case which purports to authorize a forfeiture under facts compara-ble to the facts presented here.

Counsel invite attention to Dike et al. v. Martin et al., 85 Okl. 103, 204 P. 1106, and Burkett v. Snakard et al., Okl., 365 P.2d 1006.

In Dike v. Martin, the plaintiffs, Martin, Martin, Martin, and Webster, brought ac-tion against Dike, Smith, and Pitcher, as defendants, wherein each plaintiff sought a decree determining that he was the owner of an undivided one-sixth interest in a lead and zink mining venture. The facts show that a 40 acre lease was acquired and three exploratory holes were dug which did not reveal the presence of lead or zink in suffi-cient quantity for mining. Each adventurer having paid his share of these costs as per agreement. It was then determined that the "north forty" acres would be acquired for exploratory purposes. A contract for lease was acquired by Dike, and two holes drilled on the "north forty." One of the Martins inquired of the cost of drilling so that he could pay for plaintiffs' share. Dike said there was no hurry and that he did not have the exact depths. The third hole on the "north forty" indicated lead and zink in commercial quantities and Martin stood ready and willing at all times to contribute plaintiff's share of the cost of the three wells on the "north forty." Dike accepted Mar-

tin's check for plaintiffs' share of these costs but did not cash it after consulting with Smith. Dike and Smith had not given plaintiffs any notice of any intention to terminate the venture as to plaintiffs.

In the body of the opinion therein it was said:

"*If* either party to *the* joint adventure had refused to substantially perform his obligation, his associates might terminate their relation with him *and carry out the enterprise to his exclusion,* and if for this, or any other valid reason, they chose to terminate the relationship, they could do so only by giving notice to him that the relationship was then and there ended." (emphasis supplied) (Unfortunately our Syllabus No. 6 announced this as the *general* rule.)

The foregoing quotation is a correct statement of the law under the facts in that case, because under the specific terms of their contract E. A. Martin, plaintiff was required to pay the drilling contractor immediately upon the completion of each hole, and each party was required to immediately deliver to E. A. Martin, trustee, his share of the drilling costs within five days from that date, and "if not paid within five days from that date, he shall forfeit and relinquish all right of benefit in the said lease." Thus it appears that the interest of a party in the lease would be *forfeited under the contract* unless he paid within the five days. Additionally it should be noticed that plaintiffs in that case had no investment of time or money in the "north forty" but only a contract right to continue in the venture of the "north forty" by paying their share of the costs of exploration. The case is not helpful where as here the plaintiff, Hardegree, had a substantial investment in the lease in question.

In Burkett v. Snakard et al., Okl., 365 P. 2d 1006, 1008, we said:

"At the conclusion of the trial, the court found that a joint venture had been entered into, that it had thereafter been abandoned by plaintiff, *that a settlement had been made between the parties for a nominal sum,* and rendered judgment for defendant." (Emphasis supplied.)

The record in that case amply supported the trial court's finding of *abandonment* and *subsequent settlement by the parties* for a nominal sum, and it was affirmed. I fail to see how it can be said that the Burkett case is authority for the proposition that abandonment of a joint adventure by a co-adventurer may serve to deprive him of the right to an accounting. It is authority for the proposition that where a joint adventurer abandons the venture, and enters into a settlement of his interest in the venture, and the trial court so finds, this court will not set the judgment aside unless it is clearly against the weight of the evidence.

Before closing this dissent I must confess that I am not completely satisfied that Hardegree is entitled to share in the profits of the venture as prayed by him. It may be that he is estopped. However, I am thoroughly convinced that his investment in this property as of July 8, 1957, and its value as of that date, was greater than the contribution which had been made by Mr. Zink. If this is a correct conclusion it must follow that he is entitled to be compensated for his one-half interest in the venture after first subtracting the value of his contractual obligations to Mr. Zink. The case should be reversed for new trial.

For the foregoing reasons, I respectfully dissent.

I am authorized to state that IRWIN, J., concurs in the views herein expressed.